[No. H033197. Sixth Dist. Oct. 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
KHOA KHAC LONG, Defendant and Appellant.

830

## Counsel

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit, William M. Kuimelis and Christopher Grove, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**RUSHING, P. J.—**

### I. Introduction

While working as a Vietnamese prostitute, Amy "Doe"[1] was robbed on two occasions and raped on the second occasion by a Vietnamese male who was

---

[1] At trial the victim was generally identified as Amy "Doe." Intending no disrespect, we will use her first name for clarity and to preserve her privacy. For simplicity, we will also use another witness's nickname.

identified as defendant Khoa Khac Long through investigation by a Vietnamese police detective. A jury was seated after a Vietnamese prosecutor exercised some of her peremptory challenges against the only three Vietnamese prospective jurors. After trial, the jury convicted defendant of two counts of first degree robbery (counts 1, 3; Pen. Code, §§ 211, 212.5, subd. (a))[2] and one count of rape (count 2; § 261, subd. (a)(2)) of the same victim, while finding not true that he personally used a firearm in the commission of these offenses (§§ 667.61, 12022.3, 12022.53).[3] The trial court sentenced defendant to prison for 14 years, including a six-year upper term on count 1 with a full consecutive eight-year upper term on count 2, and a six-year concurrent term on count 3. The trial court also required defendant to register as a sex offender, to provide samples for DNA and AIDS testing, and to pay various fines and fees, including a restitution fine of $7,800.

On appeal, defendant contends that (1) there was insufficient evidence that the motel rooms that were the scenes of the crimes were inhabited, (2) the trial court erred in upholding the prosecutor's use of peremptory challenges against prospective Vietnamese jurors, and (3) his sentence is unconstitutional. As we explain below, we will reverse the judgment, finding no evidence in the record substantiating one of the peremptory challenges. In light of this conclusion, we need not review the prosecutor's challenges to the two other jurors or the constitutionality of the sentence. We will consider whether the evidence was sufficient.

## II. THE EVIDENCE AT TRIAL

At trial it was undisputed that Amy was working as a prostitute both times that defendant came to her room in each of two motels on September 19 and December 3, 2006. Surveillance videos from the motels showed defendant and Amy outside her rooms at different times. It was also undisputed that they engaged in sexual intercourse on December 3. DNA testing revealed that defendant's semen was on Amy's chest. What was in dispute at trial was whether defendant robbed Amy on both occasions using a firearm and whether he raped her on the second occasion.

Defendant testified that he was a regular customer of hers, and that, on both occasions, they had consensual sex for which he paid her, as they had several times before. On the last occasion, contrary to her prior practice, she did not encourage to him to wear a condom.

According to Amy, she sometimes stayed at hotels in San Jose where she worked as a prostitute. On September 19, she was staying at the Best Western

---

[2] Unspecified section references are to the Penal Code.

[3] A fourth count, penetration by a foreign object, was dismissed on the prosecutor's motion after the presentation of the prosecutor's case-in-chief.

Inn. She got to the room around noon. She had other customers before defendant arrived in the evening. She could not recall if he had made an appointment by telephone. He was no one she had seen before. They spoke in Vietnamese. He asked to use the restroom and came out holding a small handgun. She said he could take whatever he wanted. He threatened to kill her if she did not shut her eyes, keep her mouth closed, and lie facedown on the bed. She complied. He asked her where the money was. She heard him gathering up her belongings, and, when she opened her eyes, she realized he had taken her laptop, purse, her wallet and its contents, jewelry, a watch, two cell phones, and over $1,000 in cash. She noticed that everything was gone, but she could not remember everything she had. She could not remember if any luggage was missing from her room. He ignored her plea to not take her passport and driver's license. He said that he knew where she lived and would come after her if she called the police. She talked him out of tying her up, but he had her disrobe and took photos of her with a cell phone, saying he would put them on the Internet if she called the police.

After he left, she looked out the door and called for help. Then she dressed and went to the hotel lobby, from which she telephoned a male friend, Vahidin "Max" Maksumic. After Max arrived, Amy or a hotel employee called the police.

Max had befriended Amy a few months before September 19, 2006, after meeting her in a nightclub.[4] They sometimes went shopping or out to eat. At the beginning he was not that aware of "what she was doing." She told him that she gave massages and worked in hotels. After the police came and talked to both of them on September 19, Max learned "what she does." He did not approve of it, but he had strong feelings for her. Occasionally, when she said she was hungry, he brought her a meal, lunch or dinner, at a hotel. Sometimes he visited her three or four consecutive days. Other times he would not see her for a week or two, because he traveled a lot.

San Jose Police Officer Luu Pham, the only certified bilingual Vietnamese detective, assigned himself the case and interviewed Amy. He met with her twice at a two-story house in San Jose, which was also occupied by a Vietnamese family, a husband and wife and two toddlers.[5]

The robbery frightened Amy, but a few months later, on December 3, 2006, she was working as a prostitute and staying the night in the Days Inn hotel. She arrived at the room in the daytime. Later that day, her friend Max rented the room across the hall so that he could offer her protection. He had not done that before.

---

[4] Amy testified that Max was initially a customer of hers who fell in love with her. He admitted that he gave her gifts, but he denied being a customer.

[5] Pham testified that Amy told him that she was renting a room from the family. Defendant successfully objected to this testimony as hearsay and it was stricken.

Amy had some customers that day before she opened the door in the evening to find defendant standing outside. She started to scream when she saw him, but he pulled out a handgun, held it to her head, and pulled her down on the floor. He said he was a bad man. He told her to shut up and close her eyes. He said he was going to kill her. She complied with his demand to remove her clothes. She got on the bed facedown without him telling her to. He told her to keep her eyes closed or he would shoot her right away. She told him she had hidden money in the bathroom. When he came out of the bathroom, he said that he knew she had more money than that, $500 or $600. He pressed the gun against her vagina. He asked where the rest of her money was. She said that was all she had in the room. More was in her car. She told him to take the key.

He said he would rape her if she did not give him more. He turned her over and put his penis in her vagina. She felt the gun against her face several times, which was why she did not scream for help. He ejaculated outside of her. Defendant took her cell phone but not her clothes.

After defendant left, Amy called out for help and crossed the hall to knock on Max's door, but he was not there. By that time Max had been at the hotel around four hours and was bringing things to his car so he could leave. She encountered him in the hallway and told him she had been robbed again by the same man. Max went out into the parking lot and recorded the license plate and description of a car leaving the parking lot. Amy gave this information to the police. She submitted to a medical examination.

Police investigation led to the car's registered owner, Bao Tran, an associate of defendant. On December 14, 2006, Tran reluctantly admitted to Detective Pham that defendant had borrowed his car 10 days earlier, and that when defendant returned it, he told Tran to get rid of it right away because it might have been identified by witnesses as involved in a robbery and shooting. Pham recovered one of Amy's cell phones on December 14, 2006, in a crash pad crack house located where defendant had returned the car.

### III. Sufficiency of the Evidence of Robbery

On appeal defendant contends that the prosecution failed to prove one element of first degree robbery, namely that the crime occurred in either "an inhabited dwelling house" or "the inhabited portion of any other building." (§ 212.5, subd. (a).)

The jury in this case was instructed in terms of CALJIC No. 9.42: "There are two degrees of robbery. Every robbery of any person which is perpetrated in an inhabited portion of any building is robbery of the first degree. All other

robberies are of the second degree." In opening argument, the prosecutor asserted, "I do not believe that you will hear any argument from the defense that this is, if a robbery, anything other than a first degree robbery. This is an inhabited place, even if it is just for a night. A jail cell can be a inhabited [*sic*] place. Anything where someone is actually living or staying, even temporarily, is a robbery of first degree." Indeed, defense counsel did not dispute this point in argument.

This is not the first time a California state court has been asked to decide when a hotel or motel room qualifies as "inhabited." The issue has sometimes arisen in the context of burglary convictions, because section 460 defines first degree burglary as involving, among other things, "an inhabited dwelling house" or "the inhabited portion of any other building." Section 459 provides in part that " 'inhabited' means currently being used for dwelling purposes, whether occupied or not."[6] Since the statutes use the same phrases, they should receive the same interpretation. (*People v. Fleetwood* (1985) 171 Cal.App.3d 982, 987 [217 Cal.Rptr. 612] (*Fleetwood*).)

An issue on appeal in *Fleetwood* was whether there was sufficient evidence that a prostitute's room in a boarding hotel qualified as a "dwelling house." (*Fleetwood, supra,* 171 Cal.App.3d at p. 985.)[7] Although the robbery victim had engaged in acts of prostitution in the room and it was furnished with only two mattresses and a television set, the appellate court concluded that there was substantial evidence that she also resided there. Prior to the robbery, she had been staying in the room for a week to a week and a half and she had paid up to two weeks' rent. (*Id.* at pp. 988–989.)

The contention on appeal in *People v. Villalobos* (2006) 145 Cal.App.4th 310 [51 Cal.Rptr.3d 678] (*Villalobos*) was "that an occupied motel room, such as that where these crimes took place, is not an 'inhabited dwelling house' within the meaning of the relevant statutes, if the room is rented only for one night." (*Id.* at p. 313.) In order to define "inhabited," the court considered the purpose of the burglary and robbery statutes. The burglary statutes were intended to give security and peace of mind to people in their residences. (*Id.* at p. 317.)

 "In keeping with the purpose of the statute, the term ' "inhabited dwelling house" ' has been given a 'broad, inclusive definition.' (*People v. Cruz* [(1996)] 13 Cal.4th [764,] 776, 779 [55 Cal.Rptr.2d 117, 919 P.2d 731].) Thus, although an inhabited dwelling house is a place where people ' "ordinarily live and which is currently being used for dwelling purposes" '

---

[6] This 1977 amendment of the statute codified long-standing case law. (*People v. Guthrie* (1983) 144 Cal.App.3d 832, 839–840 [193 Cal.Rptr. 54].)

[7] This was before the statute provided, as it now does, that a first degree robbery may occur in the inhabited portion of any building.

(*People v. DeRouen* (1995) 38 Cal.App.4th 86, 91 [44 Cal.Rptr.2d 842], disapproved on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 865–866 [89 Cal.Rptr.2d 279, 984 P.2d 486]), it 'need not be the victim's regular or primary living quarters' in order to be deemed an inhabited dwelling house. (*People v. Fond* (1999) 71 Cal.App.4th 127, 130 [83 Cal.Rptr.2d 660].) Rather, the ' " ' "inhabited-uninhabited" dichotomy turns . . . on the character of the use of the building.' " [Citation.] . . . "[T]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusion." [Citation.]' (*People v. DeRouen, supra*, 38 Cal.App.4th at pp. 91–92, italics omitted.) Thus, a temporary place of abode, such as a weekend fishing retreat (*U.S. v. Graham* (8th Cir. 1992) 982 F.2d 315), a hospital room (*People v. Fond, supra*, at pp. 131–132) or even a jail cell (*People v. McDade* (1991) 230 Cal.App.3d 118, 127–128 [280 Cal.Rptr. 912]), may qualify." (*Villalobos, supra*, 145 Cal.App.4th at pp. 317–318.)

"People have an expectation of freedom from unwarranted intrusions into a room in which they intend to store their personal belongings, sleep, dress, bathe and engage in other intimate, personal activities." (*Villalobos, supra*, 145 Cal.App.4th at p. 318.) This described "a hotel room, even if it is rented only for one night." (*Ibid.*)

■ *Villalobos* disagreed with emphasis placed by several cases on the occupant's intent to return to the structure. (*Villalobos, supra*, 145 Cal.App.4th at pp. 319–321.) "Neither *Fleetwood* nor any other case of which we are aware provides any rational basis for making habitation dependent upon the occupant's intention to continue using the structure as a habitation in the future. If the person is using the structure as a habitation when the burglary or robbery occurs, his possible intent to abandon the habitation in the future does not alter its character as an inhabited dwelling." (*Id.* at p. 320.)

*Villalobos, supra*, 145 Cal.App.4th concluded on page 321: "Of course, a motel room may be 'occupied' for purposes other than use as a temporary dwelling, and thus not be 'inhabited' for purposes of the burglary and robbery statutes. (See *People v. Guthrie, supra*, 144 Cal.App.3d at p. 838 [distinguishing between 'occupied' and 'inhabited'].) As implied in *Fleetwood, supra*, 171 Cal.App.3d 982, a motel room can be rented as a place to transact business, licit or illicit—in that case, prostitution. It is also not uncommon for people to rent motel rooms to conduct legitimate business meetings or transactions. The rooms are 'occupied' while these transactions or meetings take place, but they are not 'inhabited' unless, as in *Fleetwood*, they are also being used as a place of repose. Here, it was undisputed that Miller intended to stay overnight in the motel room and to sleep there as well as 'partying.' "

Looking at this passage in *Villalobos*, defendant argues that whether Amy " 'inhabited' the rooms turns on the use or uses she was making of" them. Defendant contends that the evidence in this case proved merely that the victim was occupying the hotel rooms in order to ply her trade, but not that she inhabited either room. "[T]here was no evidence that Doe had luggage, an overnight bag, or other belongings that would indicate she was inhabiting the motel rooms as opposed to just working out of them." Forgetting that his own objection to the testimony was sustained, defendant asserts that we know that Amy was renting a room from a family and living there.[8]

The Attorney General responds that "[n]o single factor is determinative, not even whether the victim has slept in the structure." That Amy brought her passport to the first room and that she could not remember if any luggage was missing after the first robbery provide substantial evidence that she was using the rooms "as a habitation, even if only for one night."

*People v. Hughes* (2002) 27 Cal.4th 287 stated at pages 354 and 355 [116 Cal.Rptr.2d 401, 39 P.3d 432]: "The use of a house as sleeping quarters is not determinative, but instead is merely a circumstance used to determine whether a house is inhabited. As observed in *People v. Hernandez* (1992) 9 Cal.App.4th 438, 441 [11 Cal.Rptr.2d 739], 'statutory amendments have eliminated the requirement that a burglary take place at night for it to be first degree burglary. [Citation.] Thus, the Legislature has rejected the view, expressed in prior case law, that the use of a house as sleeping quarters is critical.' The court in *Hernandez* upheld a conviction for first degree burglary even though the victims of the burglary had just moved into the apartment, had not unpacked their belongings, and had not yet slept there. (*Id.*, at pp. 440–442.)"

*People v. Meredith* (2009) 174 Cal.App.4th 1257 reviewed precedent as follows on page 1266 [95 Cal.Rptr.3d 297]. " 'For purposes of the California first degree burglary statute, a structure "need not be occupied *at the time*; it is inhabited if someone lives there, *even though the person is temporarily absent*." (2 Witkin & Epstein, Cal. Criminal Law [(3d ed. 2000)] Crimes Against Property, § 114, p. 144; see *People v. Hughes*[, *supra*,] 27 Cal.4th 287, 354–355 . . . [apartment was inhabited even though occupant was in process of moving; her furnishings remained there, and she was present in apartment during daytime hours]; *People v. Hernandez*[, *supra*,] 9 Cal.App.4th 438 . . . [apartment was inhabited when tenants moved all of their belongings into it, but had not yet slept in it or unpacked]; *People v. Jackson* (1992) 6 Cal.App.4th 1185 [8 Cal.Rptr.2d 239] [dwelling continued to be inhabited because tenant who intended to move out had not vacated premises and was

---

[8] In defendant's reply brief, this house in San Jose inexplicably becomes a house in Sacramento.

still using the house at time of robbery]; *People v. Marquez* (1983) 143 Cal.App.3d 797, 800, 802 [192 Cal.Rptr. 193] [house inhabited even though resident, under conservatorship, had been absent for two and a half years, because resident intended to return]; CALJIC No. 14.52 ["[an inhabited dwelling house] is inhabited although the occupants are temporarily absent"].) A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters. (*People v. Cardona* (1983) 142 Cal.App.3d 481, 483 [191 Cal.Rptr. 109] [house no longer inhabited when residents had moved and no identifiable person was currently using it as sleeping quarters]; *People v. Valdez* (1962) 203 Cal.App.2d 559 [21 Cal.Rptr. 764] [house not inhabited when previous tenant had moved out a week earlier and new tenant had not moved any belongings into house].)' (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 132 [18 Cal.Rptr.3d 550], italics added.)"

■ This survey of precedent tells us that a popular test for whether a building is "inhabited" is whether someone is using it as a temporary living quarters; in other words, whether the building is serving as the functional equivalent of a home away from home. This characterization should be made from the perspective of the victim (*People v. Aguilar* (2010) 181 Cal.App.4th 966, 970 [104 Cal.Rptr.3d 420]), not the criminal (*People v. Parker* (1985) 175 Cal.App.3d 818, 824 [223 Cal.Rptr. 284] ["in a prosecution for first degree burglary, the fact that a defendant does not know that the building he is about to burglarize is a residence is irrelevant"]).

In this case it does not appear that the prosecutor felt a need to introduce much evidence on the status of Amy's occupancy of the hotel rooms. She elicited from Amy that she sometimes stayed in San Jose hotels when she was working as a prostitute, she was staying at the Best Western Inn on September 19, 2006, she got to the hotel around noon that day, and she had other customers before defendant arrived that evening. Amy was staying the night of December 3, 2006, in a room in the Days Inn. She did not recall exactly when she arrived, but it was in the daytime. She had some customers before defendant arrived. The prosecutor did not ask Amy if she had prepaid for either room, how long she intended to stay, how long she customarily stayed, what she brought to each room, or whether she intended to do anything in either room other than engage in prostitution.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable

doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)" (*People v. Singleton* (2007) 155 Cal.App.4th 1332, 1339 [66 Cal.Rptr.3d 738] [no substantial evidence of presence in residence during burglary].) "When reviewing the sufficiency of evidence on appeal, as long as circumstances reasonably justify the fact finder's determination, we must accept it, even though another fact finder may have reasonably determined the opposite." (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1106 [92 Cal.Rptr.2d 236].)

The Attorney General asserts that because Amy could not remember if any luggage was missing, it is reasonable to infer that she had luggage in the room. We consider this too speculative. However, there was other evidence of Amy's hotel routine that the Attorney General has not emphasized. Her friend Max occasionally visited her three or four nights in a row in hotels and sometimes brought her meals. That Amy was dining in and socializing at hotels on other occasions is substantial evidence that she was not using the hotel rooms simply as places of business or offices, but as temporary living quarters. There was no evidence of her sleeping at a hotel, but that is merely one circumstance among many relevant to showing habitation.

In our view, a couple on a honeymoon who uses a motel bed for sexual activity instead of sleeping is still inhabiting the room. They are engaging in the kind of intimate, personal, and private activities indicative of a living quarters and not a workplace. This is also true of other couples not on a honeymoon. Notwithstanding the implications of *Fleetwood* and *Villalobos*, we question whether the fact that Amy was compensated for her sexual activity should be regarded as transforming her motel room into some kind of uninhabited office. Surely a business traveler who takes advantage of free Wi-Fi and Internet connections available in a hotel room to transact some business and make some money is entitled to the same protection from robbery as the motel occupant in *Villalobos*, who was using methamphetamine in the room in anticipation of the arrival of a female with whom he hoped to have sex. (*Villalobos, supra*, 145 Cal.App.4th 310, 314.) We would conclude that the business traveler's room is inhabited while he or she is doing business as well as resting.

However, we are not required to decide whether a motel room is "inhabited" within the meaning of section 212.5, subdivision (a), if the occupant has rented it "solely for purposes of consummating prostitution transactions." (*Jennings v. U.S.* (D.C. Cir. 1981) 431 A.2d 552, 555.) Here there was substantial evidence that the victim, by socializing with a friend and eating meals, used hotel rooms as living quarters, thereby inhabiting the rooms at the time defendant robbed her.

## IV. THE PROSECUTOR'S PEREMPTORY CHALLENGES

Defendant asserts that the trial court erred in denying his motion challenging the Vietnamese prosecutor's use of peremptory challenges against prospective jurors who appeared Vietnamese. We will set out aspects of the jury voir dire where relevant to our discussion.

### A. *The Prosecutor's Explanations and the Court's Ruling*

Upon exercise of the prosecutor's ninth peremptory challenge to a prospective juror, defendant made a motion questioning the basis for the prosecutor's challenging of three individuals with "Vietnamese names." Defendant asserted there was no apparent reason for the challenges other than "because they're apparently Vietnamese."

The court asked if the prosecutor wanted to respond and the prosecutor offered the following explanations. As to T.N., he did not contribute to or participate in any of the discussion that ensued when the court asked questions of the entire panel. "Obviously, participating in a discussion doesn't necessarily mean that he is not a juror. It was my sense that he would not be a participating member of the jury. He was not contributing to our conversations. It was impossible for me to figure out where he stood on any of the issues that I think are at least relevant" and should provoke some dialog. Moreover, he "did not make eye contact with me during the time throughout the entire process of us questioning the first 12 jurors, and it was based on that that I did not feel he was a participating member of the jury, and I did not feel comfortable with his body language and the way that he was expressing himself, or able to express himself in the context of a juror."

As to K.P., who was called after other prospective jurors were excused, the prosecutor stated that she was concerned about his language abilities. He "seemed to answer the questions in the affirmative or negative that did not correspond with the question that was being asked. [¶] For instance, the court would say, is it correct that you can follow the law, and he would say no. [¶] So I was significantly concerned about that. English was clearly his second language, and I am concerned in a case like this where we have special allegations, and I think we have lesser included offenses and things like that, I was concerned that his language ability could present a challenge to the jury

deliberation process."[9] The prosecutor also asserted her belief that K.P. was Cambodian, not Vietnamese.

As to C.H., who was also called after other prospective jurors were excused, the prosecutor stated that she was excused because her sister, one year different in age, was a defendant in a criminal fraud prosecution by the prosecutor's office. "[A]lthough she [(C.H.)] said she [(her sister)] was treated with respect, at this point when someone close to you is involved in a criminal process and is being treated as a defendant, is being prosecuted by my office, it's appropriate to excuse her."

At the conclusion of the hearing on May 12, 2008, the trial court stated: "I had the People respond because it was the court's feeling that there was some pattern. I am satisfied by the People's explanation" that the reasons given were "legitimate" and not based on the individual's national origins.

The following day, the court put the following on the record in order to give "any reviewing court the benefit of my thinking. [¶] I would note a couple of things parenthetically. One is is that both [*sic*] the defendant, the accused, and the prosecutrix are Vietnamese. Secondly, I've taught *Wheeler*[10] analysis to both the Public Defender's office in L.A. as well as the District Attorney's office here in Santa Clara County when I was in those offices. So I have the analysis firmly entrenched in my mind, but it occurred to me that I'd—when I denied the *Wheeler* motion, it really didn't afford review or the basis of my reasoning. So here it goes.

"First, I determined that a reasonable inference existed of a pattern of peremptory challenges against an identifiable group, to wit, Vietnamese. And I believe that all three of the individuals were, in fact, Vietnamese.

---

[9] What the prosecutor was referring to presumably were these exchanges.

"The court: Any problem with the idea that the prosecutor must prove the charges beyond a reasonable doubt?"

"Juror [K.P.]: Yes.

"The Court: Yes, do you have a problem?

"Juror [K.P.]: No.

"The Court: I think I can tell that's what you mean when you said the word?

"Juror [K.P.]: Yeah."

After some other questions, this exchange occurred.

"[The Prosecutor]: And the one witness rule, any problems with the idea that one witness, if that witness is believed to be beyond a reasonable doubt that should be a basis for a guilty verdict?

"Juror [K.P.]: Yes.

"[The Prosecutor]: Yes, you have a problem with it, or no?

"Juror [K.P.]: Can you repeat the question again?"

K.P. answered yes when asked if he could base a guilty verdict on one witness's testimony.

[10] *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).

"Secondly, the prosecutor volunteered, which I found appropriate, to give her reasons for removing each of those individuals. After hearing those reasons, I reviewed my notes and observations and concluded that they were each removed for a nonrace-based reason; therefore, I concluded the removals were a legitimate exercise of peremptory challenges by the People and not a violation of the *Wheeler-Batson*.[11]"

### B. *The Standards Applicable to Trial and Appellate Courts*

In *People v. Watson* (2008) 43 Cal.4th 652 [76 Cal.Rptr.3d 208, 182 P.3d 543], a decision issued on May 8, 2008, just four days before the motion in this case, on page 670 the California Supreme Court stated the standards to be applied in the trial and appellate courts in reviewing such motions. "Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.) In *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*), 'the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" ' (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622], quoting *Johnson, supra*, 545 U.S. at p. 168; see also *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203].)

"Moreover, as *Johnson* explains, 'a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson, supra*, 545 U.S. at p. 170.) At step three, 'the trial court "must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' [Citation.]" ' (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) A prosecutor's reasons for exercising a peremptory challenge 'need not be sufficient to justify a challenge for cause.' (*People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521].) 'Jurors

---

[11] *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).

may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias.' (*Ibid.*; see also *People v. Box* (2000) 23 Cal.4th 1153, 1186, fn. 6 [99 Cal.Rptr.2d 69, 5 P.3d 130].)"

"The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 [80 Cal.Rptr.3d 98, 187 P.3d 946] (*Lenix*); *Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 115 S.Ct. 1769].)

■ Regarding the need for findings by the trial court, *People v. Reynoso, supra*, 31 Cal.4th 903, 923 (*Reynoso*) quoted the following from *People v. Silva* (2001) 25 Cal.4th 345, 385–386 [106 Cal.Rptr.2d 93, 21 P.3d 769]: " 'Although we generally "accord great deference to the trial court's ruling that a particular reason is genuine," we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (Italics omitted.) But *Reynoso* later explained on page 929, "Neither [*People v.*] *Fuentes* [(1991) 54 Cal.3d 707 [286 Cal.Rptr. 792, 818 P.2d 75]] nor *Silva* requires a trial court to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge." (*Reynoso*, at p. 929.) Recently, in *Thaler v. Haynes* (2010) 559 U.S. ___, ___ [175 L.Ed.2d 1003, 130 S.Ct. 1171], the court explained that *Snyder v. Louisiana, supra*, 552 U.S. 472 (*Snyder*) does not forbid a judge from accepting a prosecutor's demeanor-based explanation though the judge neither recollected nor even observed the jury voir dire. (*Thaler v. Haynes, supra*, 559 U.S. at pp. ___–___ [130 S.Ct. at pp. 1174–1175].)

"The existence or nonexistence of purposeful racial discrimination is a question of fact." (*People v. Lewis* (2008) 43 Cal.4th 415, 469 [75 Cal.Rptr.3d 588, 181 P.3d 947].) On appeal, "[w]e review a trial court's ruling at step three for substantial evidence." (*People v. Watson, supra*, 43 Cal.4th 652, 671.) Trial judges have a superior vantage point in hearing and seeing both the prospective jurors' demeanor in answering questions and the manner in which prosecutors exercise peremptory challenges, and their express and implied factual determinations based on these personal observations are accordingly owed deference by appellate courts that review merely the recorded transcript of the proceedings. (Cf. *Reynoso, supra*, 31 Cal.4th 903,

926; *Lenix, supra,* 44 Cal.4th 602, 613–614; contra, *People v. Alvarez* (1996) 14 Cal.4th 155, 198, fn. 9 [58 Cal.Rptr.2d 385, 926 P.2d 365] [independent review].)

When a trial court does "not satisfy its *Batson/Wheeler* obligations, . . . the conviction . . . must be reversed. Such 'error is prejudicial per se: "The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside." ' (*People v. Wheeler, supra,* 22 Cal.3d at p. 283.)" (*People v. Allen* (2004) 115 Cal.App.4th 542, 553 [9 Cal.Rptr.3d 374], fn. omitted.) "The exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva, supra,* 25 Cal.4th 345, 386 (*Silva*).)

### C. *The Challenge to T.N.*

The prosecutor stated that she excused T.N. because, during questioning of the entire panel, he did not participate in the discussion. Also he "did not make eye contact with me during the time throughout the entire process of us questioning the first 12 jurors, and it was based on that that I did not feel he was a participating member of the jury, and I did not feel comfortable with his body language and the way that he was expressing himself, or able to express himself in the context of a juror."

Neither defense counsel nor the court questioned the prosecutor's general assertions about her subjective discomfort and she did not further describe what in particular it was about T.N.'s body language or the way he expressed himself that made her uncomfortable, unless it was the lack of eye contact or purported nonparticipation. In ruling on defendant's motion, the court generally pronounced itself satisfied that the prosecutor's reasons as to all three prospective Vietnamese jurors were "legitimate." Later recognizing that this ruling "really didn't afford review or the basis of my reasoning," the following day the court stated, "I reviewed my notes and observations and concluded that they were each removed for a nonrace-based reason; therefore, I concluded the removals were . . . legitimate."

On appeal, defendant disputes the accuracy of the prosecutor's recollection, asserting that T.N. twice volunteered information in response to general questions to the jury panel, stating that his father was a retired attorney and that a sexual assault victim might not immediately report a crime because she was afraid. The Attorney General concedes that the prosecutor's comment about T.N.'s nonparticipation "might not have been correct." Indeed, the assertion is demonstrably false from the reporter's transcript.

The Attorney General notes that T.N. was the last to answer a question about family members or close friends in the court system. From this the Attorney General claims to discern that T.N. hesitated in answering the group questions and asserts, "The fact that defense counsel did not challenge the prosecutor's explanation also suggest[ed] that he agreed with the prosecutor's assessment that [T.N.'s] hesitation was tantamount to not coming forward at all."

It is hard to know what to make of defense counsel's silence. Occasionally, similar silence has been treated as acquiescence in a prosecutor's characterization of a prospective juror. (Cf. *People v. Adanandus* (2007) 157 Cal.App.4th 496, 510 [69 Cal.Rptr.3d 25] ["Additionally, neither the trial court nor defense counsel below contradicted the prosecutor's account of any of the challenged jurors' demeanor or manner of responding to his questions, suggesting the prosecutor's description was accurate."]; *People v. Davis* (2009) 46 Cal.4th 539, 584 [94 Cal.Rptr.3d 322, 208 P.3d 78] ["the prosecutor's unrefuted description of three of the prospective jurors in question as 'Caucasian' weakens any inference of group bias that can be drawn from his exercise of peremptory challenges against them"].) In this case, however, where T.N.'s responsiveness to group questions was clearly documented, defense counsel may have thought that the prosecutor's misstatement spoke for itself.

■ As to the Attorney General's suggestions that the prosecutor actually meant that T.N. was hesitant, reluctant, or fearful when she said that he did not participate, we will not ascribe these unstated reasons to her. Adapting language from *Miller-El v. Dretke* (2005) 545 U.S. 231, 252 [162 L.Ed.2d 196, 125 S.Ct. 2317] (quoted by *Lenix, supra*, 44 Cal.4th 602, 624–625), we observe: "It is true that peremptories are often the subjects of instinct [citation], and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his [or her] reasons as best he [or she] can and stand or fall on the plausibility of the reasons he [or she] gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, [the Attorney General,] or an appeals court, can imagine a reason that might not have been shown up as false."

*Lenix, supra*, 44 Cal.4th 602 stated: "*Miller-El* . . . and *Snyder* demonstrate that an adequate record is critical for meaningful review. Counsel and the trial court bear responsibility for creating such a record. *Miller-El* . . . admonishes prosecutors faced with a *Wheeler/Batson* claim to provide as complete an explanation for their peremptory challenge as possible." (*Id*. at p. 624.)

We note that the prosecutor gave other reasons for challenging T.N. than his nonparticipation, namely his body language, the way he was expressing himself, and his lack of eye contact.

Appellate courts are aware of the limitations of the appellate record in revealing the various methods of human communication. As *Lenix, supra,* 44 Cal.4th 602 stated: "Experienced trial lawyers recognize what has been borne out by common experience over the centuries. There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. 'Even an inflection in the voice can make a difference in the meaning. The sentence, "She never said she missed him," is susceptible of six different meanings, depending on which word is emphasized.' [Citation.]" (*Id.* at p. 622.) Depending on intonation and facial expression, the same or similar answers coming from different prospective jurors may have very different meanings, and "those differences may legitimately impact the prosecutor's decision to strike or retain the prospective juror." (*Id.* at p. 623.)

Without audio-visual recordings of jury voir dire, appellate courts must review a prosecutor's exercise of peremptory challenges without all the behavioral information available to the trial court. This institutional limitation is part of what underlies the deference traditionally accorded the trial court, exemplified by the following comments of the California Supreme Court. "Since the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing [a prospective juror], including the demeanor-based reason, were sincere and genuine, is entitled to 'great deference' on appeal." (*Reynoso, supra,* 31 Cal.4th 903, 926.)

Doubt may undermine deference, however, when the trial judge makes a general, global finding that the prosecutor's stated reasons were all "legitimate," and at least one of those reasons is demonstrably false within the limitations of the appellate record. A trial court "should be suspicious when presented with reasons that are unsupported or otherwise implausible." (*Silva, supra,* 25 Cal.4th 345, 385.) "Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent (*People v. Williams* (1997) 16 Cal.4th 153, 189 [66 Cal.Rptr.2d 123, 940 P.2d 710]), it is another matter altogether when, as here, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to

probe the issue [citations]. We find nothing in the trial court's remarks indicating it was aware of, or attached any significance to, the obvious gap between the prosecutor's claimed reasons for exercising a peremptory challenge against M. and the facts as disclosed by the transcripts of M.'s voir dire responses. On this record, we are unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' [citation] and to clearly express its findings [citation]." (*Silva, supra*, 25 Cal.4th 345, 385.)

Even without a provably wrong statement, the United States Supreme Court has expressed concerns about what implied findings may reasonably be inferred. *Snyder, supra*, 552 U.S. 472 observed: "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike. Here, however, the record does not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor. The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous." (*Id.* at p. 479.)

In *Reynoso, supra*, 31 Cal.4th 903, the California Supreme Court labored to reconcile its prior pronouncements about how to conduct *Wheeler/Batson* hearings, with a particular focus on the implications of *Silva, supra*, 25 Cal.4th 345. In reviewing *People v. Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], the court commented that the opinion reiterated the trial court's obligation to make a sincere and reasoned attempt to evaluate the prosecutor's reasons. The court continued, "But in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's race-neutral reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom." (*Reynoso, supra*, 31 Cal.4th at p. 919.) Later, the court stated, "The impracticality of requiring a trial judge to take note for the record of each prospective juror's demeanor with respect to his or her ongoing contacts with the prosecutor during voir dire is self-evident." (*Id.* at p. 929.)

■ *Reynoso, supra*, 31 Cal.4th 903 reached a highly qualified conclusion on page 929. "Where, as here, the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible (*Silva, supra*, 25 Cal.4th at p. 386), and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge."

This conclusion is inapplicable by its terms when, as in this case, one of the stated reasons deemed by the trial court to be a "legitimate" basis for excusing a prospective juror is contradicted by the record. In reviewing the trial court's ruling, we find a lack of substantial evidence supporting the prosecutor's stated reasons as to T.N. In particular, any implied finding that T.N. failed to answer general questions was erroneous. This casts doubt on other arguably implied findings confirming T.N.'s lack of eye contact, adverse body language, and way of expressing himself.

The trial court's inquiry in the face of a *Batson/Wheeler* motion is always factual—was the peremptory challenge based on the prospective juror's race or another impermissible ground? Here the prosecutor only offered her opinion, and then only impliedly, on something the juror did when she said "body language." Nothing factual about T.N.'s body language has been made to appear in the record. To credit such a general utterance would nullify the principle of law and would constitute the functional equivalent of "take my word for it," with the trial judge saying, "Yes, I will." Where a nonverifiable utterance is made sufficient to satisfy a principle of law, the principle is usually lost.

"[S]imply saying that a peremptory challenge is based on 'her demeanor' without a fuller description of what the prospective juror was or was not doing provides no indication of what the prosecutor observed, and no basis for the court to evaluate the genuineness of the purported non-discriminatory reason for the challenge. '[H]er very response to your answers,' her 'dress' and 'how she took her seat' without additional elaboration are not responses that can be evaluated by the trial judge, and they certainly cannot be evaluated on appeal." (*People v. Allen, supra*, 115 Cal.App.4th 542, 551, fn. omitted.) "While specific findings were not required, probing into what specifically about Ms. W.'s body language, dress and demeanor the prosecutor disliked presumably would have provided descriptions which the court

could have evaluated in determining the genuineness of the proffered explanation." (*Id.* at p. 553, fn. omitted.)

■ We do not expect trial judges to provide a continuous recorded narrative during jury voir dire of the appearance, behavior, and intonation of each prospective juror. However, when the prosecutor bases a peremptory challenge on an unrecorded aspect of a prospective juror's appearance or behavior, we must and will look for some support in the record for the prosecutor's observation. In this case, the record is devoid of any mention, let alone description, by the trial judge or the prosecutor of what was disturbing or unseemly about T.N.'s body language or his way of expressing himself. We are unable to extend normal deference to the trial court's implied finding on this point when another stated reason, though pronounced "legitimate" by the trial court, was demonstrably inaccurate. We must conclude that the trial court erred in accepting the prosecutor's virtually unverifiable and unverified explanation for challenging T.N. This "conclusion makes it unnecessary to determine whether the trial court erred in denying the *Batson/Wheeler* motion as to the other" two Vietnamese prospective jurors. (*Silva, supra,* 25 Cal.4th 345, 386.)

### DISPOSITION

The judgment is reversed.

Premo, J., and Elia, J., concurred.