Filed 4/23/13  P. v. Long CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037564 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC775750) |
| v. | |
| KHOA KHAC LONG, | |
| Defendant and Appellant. | |

On retrial after this court reversed a previous conviction, defendant Khoa Khac Long was again found guilty by a jury of two robberies and one rape perpetrated against the same victim on two separate occasions.  The sole question on appeal is whether the record contains substantial evidence that the hotel room in which the victim was plying her trade as a prostitute at the time on the earlier of these occasions was "inhabited," such that the jury could find the robbery to be one of the first degree.  (See Pen. Code, § 212.5, subd. (a).)[1]  In the first appeal we held the evidence sufficient to sustain such a finding.  Here, although the evidence was weaker in some respects, it was stronger in one critical

_____

[1] Unspecified section references are to the Penal Code.

Section 212.5, subdivision (a) provides in pertinent part:  " . . . [E]very robbery which is perpetrated in an inhabited dwelling house . . . or the inhabited portion of any other building is robbery of the first degree."

respect:  the victim's testimony that she occasionally slept in the room in question.  Based primarily on that testimony we will conclude once again that the evidence was sufficient to sustain a finding that the room was an "inhabited portion" of a building as contemplated by the statute.  (§ 212.5, subd. (a).)  Accordingly, we will affirm the judgment.

**BACKGROUND**

**A.  *First Robbery***

Defendant was accused of robbing the victim on September 19, 2006, and robbing and raping her on December 3, 2006.  We reversed his original conviction on the ground that the prosecutor had improperly excused from the jury all persons appearing to be of Vietnamese extraction.  (*People v. Long* (2010) 189 Cal.App.4th 826, 848 (*Long I*).)  The following account is derived from the evidence adduced at the second trial after this court remanded the matter.

The victim was referred to at trial as Amy T., though that is not her real name; we will refer to her as Amy.  She testified that in the fall of 2006 she took money for massages and sex in motel and hotel rooms that she rented in east San Jose.[2]  She got customers by advertising in a Vietnamese magazine.  When a customer called in response to an ad, she would direct him to the hotel she was using, instructing him to call or text when he arrived.  When he reported his arrival, she would give him her room number.

On September 19, 2006, Amy was hosting "clients" in a room at the Best Western Lanai Garden Inn and Suites (Lanai Gardens).  She answered affirmatively to questions whether she "stay[ed] occasionally" at that facility during the fall of 2006.  At about

---

[2]  Our original opinion generally characterized these rooms as "motel" rooms.  (*Long I*, *supra*, 189 Cal.App.4th 826, 831.)  As will appear, the jury instructions at the second trial also spoke of "motel" rooms.  On the other hand, the prosecutor's questions and jury argument routinely referred to "hotels" and "hotel" rooms.  We understand there is a difference between motels and hotels, but the jury was not informed of any legal or practical distinction and we use the words interchangeably in this opinion.

2

8:33 p.m., hallway surveillance cameras recorded a man arriving at her door. She testified that she went to the door in response to a knock, and admitted defendant into the room, supposing him to be a client. He entered the bathroom, ostensibly to use it, and turned on the water "very loud." When he emerged he was pointing a handgun at her with a towel over his hand, and threatening in Vietnamese to kill her. He turned on the TV, also "very loud." He said he would shoot her if she screamed. At his direction she lay on the bed, face down, with her eyes mostly closed. He went through her belongings, which included a laptop, two cell phones, her passport, and a purse containing jewelry, her identification, credit cards, and over $1,000 in cash. He told her that he knew where she lived and would go after her if she called police. She said she would not do so, but asked him to leave her "paperwork," apparently meaning her identification, by her car in the parking lot. She talked him out of tying her up but, at his direction, removed her dress. He took nude pictures of her on his mobile phone and told her he would post them on the internet if she made a big deal of his actions. At his direction, she again lay face down on the bed while he left the room. A surveillance camera depicted him leaving the room at 9:17 p.m.

After defendant left, Amy found that all her belongings were gone except her car keys and clothing. She dressed and ran out to the parking lot, where she found that her stuff was not under her car. She went to the front desk of the hotel and said she had been robbed. She called a friend nicknamed "Max." She described him as a former client who loved and cared for her and bought her gifts. He testified that he was in love with her, and did not consider himself to be one of her customers. Now, at her request, he came to the hotel. At some point thereafter the police arrived. While questioning Max, an officer told him that Amy admitted being a prostitute. Max testified that he had refused to believe it up to that moment, but now began to "see her in [a] different light," though he still liked her.

3

After this incident Amy continued to ply her trade, but Max became more involved in her life. According to him, she was scared by the robbery and called him every day asking him to do various favors for her. He sometimes brought her sundries such as toothpaste, mouthwash, or an analgesic, but usually he brought her food from a Vietnamese restaurant. He mostly saw her at the Days Inn. Sometimes he would wait in the parking lot for her to call him. Sometimes she would not call for two hours and he would leave with the food, but then when she did eventually call he would usually return with the food. Sometimes they would just talk and not eat between her customers. Amy told Max that she was going to quit that line of work.

## B. *Second Robbery and Rape*

On December 3, 2006, Amy was working in a room at the Days Inn. On that day Max had decided, for the first time, to rent a room near hers in order, according to Amy, to offer her comfort and protection. He still had feelings for her, and when he saw her first customer arrive, he felt awful and disgusted. He could not bear to watch other customers arrive, so he walked around the hotel premises and to a nearby business. At some point he decided he could not tolerate the situation, and loaded his belongings back into his car; then he returned them to his room; then he decided he was really going to leave, and put everything except his laptop back into his car. However he did not want to leave without telling Amy, so he tried to call her several times. When she did not answer, he "thought maybe is something wrong." He approached her door, but was reluctant to knock.

Meanwhile—apparently during Max's irresolute perambulations—defendant had called Amy, representing himself, inferentially, as a customer. Not recognizing his voice, she gave him her room number. She heard a knock at her door, but on looking through the peephole saw nothing. When she opened the door to peek out, defendant pushed into the room. She started to call for help, but he pulled out a handgun, shut the door, and pushed her to the floor, threatening to shoot her if she called for help. Without

4

being told, she lay on the bed quietly, face down.  She heard defendant opening drawers and looking around.  He asked where she had hidden her money.  She said it was under the toilet.  He told her to remove her clothes, for the purpose—she thought—of inhibiting efforts to escape.  At some point he also pulled the phone line out of the wall.  He searched the bathroom and found $500 or $600.  He said it was not enough.  She insisted it was all she had.  He then placed the tip of the gun against her anus, vagina, or both.  She started to cry and told him that, having learned from the previous incident, she had stashed the bulk of her cash in her car.  She said there was nothing in the room except her mobile phone and keys; she suggested he take the latter and get the cash from her car.  Instead he said he would rape her if she did not come up with more money.  When she failed to do so, he turned her over and inserted his penis in her vagina.  Refusing her entreaties to "put protection on," he eventually ejaculated on her torso.  He told her to turn back over, then left with her money and cell phone.  A hotel surveillance video showed him walking down the hallway at 7:15 p.m.

A minute later Amy emerged from her room and saw Max in the hallway.  She told him she had been robbed and raped by the same person.  Max, who had seen defendant walking down the hallway, ran to the hotel parking lot.  He saw a gold Acura driving away, and wrote down its license number.  He gave a written description to Amy, and left.

Amy reported the incident to police.  She gave them Max's description of the car and the phone number from which the robber had called her before the robbery.  The vehicle description led to the car's owner, who admitted to police that defendant had borrowed his car and was in a panic when he returned it, saying it had been used in an armed robbery involving fired shots.  A detective found Amy's cell phone at the house where defendant had returned the car.  Eleven days after the robbery, Amy positively identified defendant in a photo lineup.  DNA testing revealed that the semen on her stomach matched his.

5

## C. *Defendant's Testimony*

Defendant testified that he had no idea why Amy accused him of robbing and raping her. He depicted himself as a regular customer who had begun seeing her in August 2006. He was first introduced by a mutual friend and then responded to her advertisements under the name of "Cindy" in a Vietnamese magazine. He met her three times at a residence in San Jose, where he paid her $120 to have sex using a condom. He claimed that the same thing happened on September 19, 2006, except that he met her in a hotel. He left her room that day carrying a box of movies he had lent to her earlier. After that he did not see her so regularly, but he did see her again in a different motel on December 3, 2006. This time he paid her $150 to let him forego the condom. He had left California at the end of December 2006 to work in Atlanta.

## D. *Amy's Residence*

Three witnesses at trial described where Amy lived in the fall of 2006. Max described her as "stay[ing]" at the Lanai Gardens when he first met her, but when asked what he meant by this he alluded to her prostitution activities. He recalled her saying that she also rented a room in a family house in San Jose. He understood her to also have a room or apartment in Monterey, where she was trying to open a business.

Amy testified that she kept her personal belongings and clothes in a room she rented from a family in San Jose. She rented motel rooms for business. However, when defense counsel asked her to affirm, with reference to the Lanai Gardens, that "[y]ou weren't sleeping there, you weren't living there," she answered, "Sometimes I stay over; sometime I go home. But mostly I going [*sic*] home." She testified similarly on redirect with more general reference to "these hotels," i.e., "Sometime I sleep over; sometime I go in my house." She answered negatively the prosecutor's question whether she would "bring overnight stuff" to the hotel rooms. When asked if she had been planning to go home on September 19, 2006, she answered, "I don't pay attention that"—a construction she used throughout trial to mean that she had no present memory of the fact in question.

6

Detective Pham recalled taking Amy to her residence in San Jose after the second robbery. She was renting a room in a residence from a family of four. She did not want uniformed officers coming there because "she didn't want the family to have the impression that she might have been in trouble with the police or with the law."

**E.  *Instructions, Deliberations, Verdict***

Prior to submitting the matter to the jury, the trial court instructed that in order to prove defendant guilty of first-degree robbery, the prosecution had to "prove that the robbery was committed in an inhabited dwelling." The court explained this requirement by saying, "An occupied motel room may be an inhabited dwelling . . . for the purpose of the preceding instruction. Whether a motel room is an inhabited dwelling or not is a question of fact that the jury must decide."

The prosecutor argued that the first robbery was of the first degree because the room at the Lanai Gardens was "a place where [Amy] would reasonably expect to be free from unwanted intrusion," where she "control[led] who comes and goes," stored personal belongings, and "conduct[ed] intimate personal activities." She argued that the robbery at the Days Inn was also of the first degree because, in addition to these factors, "occasionally she would sleep there."[3]

The jury deliberated a full day and into the next day. In the early afternoon, it submitted a query to the court, asking, "Can we see the actual requirements of what 'is' an inhabited dwelling[?]" Over defense objection, the court provided the following written answer at 2:31 p.m. "A dwelling is inhabited if someone lives there and either is present or has left but intends to return. [¶] Let me know if you need any more information."

At 2:45 p.m., the jury submitted a further inquiry: "Was the DA's explaination [*sic*] of a inhabited [*sic*] dwelling (sleeping, bathing, dressing, intimacy) requirements for

---

[3] The prosecutor thus appeared to get the evidence on this point reversed.

7

this or her interpretation of what it is.  Does the person <u>have</u> <u>to</u> 'live' there for it to be an inhabited dwelling?"**4**  The parties agreed on the following answer, which was given to the jury in writing.  " 'Inhabited dwelling' is a place where people have an expectation of freedom from unwarranted intrusion into a room in which they intend to store personal belongings, sleep, dress, bathe, and engage in other intimate personal activities.  No single factor is determinative of whether a place constitutes an 'inhabited dwelling.'  [¶]  A motel room can be rented as a place to conduct business legal or illegal.  It is also not uncommon for people to rent motel rooms to conduct legitimate business transactions.  These rooms are occupied while these transactions take place, but they are not inhabited unless they are being used as places of repose."

---

**4**  The prosecutor had argued, "to give you some guidance in what makes something an inhabited dwelling, you look to whether a reasonable person would expect that place to be free from unwarranted intrusion.  [¶]  People who expect places to be free from unwarranted intrusion—these are the kind of things that they might do there:  store belongings, sleep, dress, bathe, engage in other intimate personal activities.  In short, this is a place of repose."  With respect to the Lanai Gardens room, the prosecutor had argued that a finding of habitation was supported by the fact that the door was locked and that Amy controlled who entered the room:  "This isn't like a ice cream store where the doors open and people come in and out.  This is a closed room where she controls who comes and goes."  She also cited the fact that Amy was "storing her belongings there.  She had her laptop there.  She had her very—her most important papers there—her passport, her driver's license.  She had her purse there."  In addition, "she changed clothes there in terms of going from wearing clothes to not wearing clothes with a customer to back wearing clothes," she or her customers bathed there, and "there were intimate personal activities going on," i.e., "not the kind of activities where this isn't a travel agency— where you might wander in while business is being conducted."  The prosecutor concluded this portion of her argument by saying, "The concept with a first-degree robbery is that we want to afford more protection to people in their homes or their home away from home.  Now, defense is going to argue that this was just a place she was doing business, but this is more than a place she's doing business.  This is a place where she was conducting intimate personal activities, where she had a key, a lock, where she ate, where she controlled who was coming in and out.  So you can find this to be a first-degree robbery."

The jury deliberated until shortly after 11:00 a.m. on the third day, when it returned verdicts of guilty of first degree robbery on September 19, 2006 and rape and second degree robbery on December 3, 2006.  The court sentenced defendant to 8 years, four months in prison.  Defendant filed this timely appeal.

**DISCUSSION**

## I.  *Introduction*

A robbery is of the first degree if "perpetrated in an inhabited dwelling house . . . or the inhabited portion of any other building."  (Pen. Code, § 212.5, subd. (a).)  Similarly, a burglary is of the first degree if it is "of an inhabited dwelling house . . . or the inhabited portion of any other building."  (Pen. Code, § 460, subd. (a).)  "Since the statutes use the same phrases, they should receive the same interpretation."  (*Long I*, *supra*, 189 Cal.App.4th at p. 834, citing *People v. Fleetwood* (1985) 171 Cal.App.3d 982, 987.)  "Inhabited" is defined in the burglary statutes as "currently being used for dwelling purposes, whether occupied or not."  (Pen. Code, § 459.)  Thus the key question is whether the hotel room where the September 19 robbery occurred was "being used for dwelling purposes" at the time of the offense.

In the first trial of this matter the jury found that both the September 19 robbery and the December 3 robbery were robberies of the first degree.  (*Long I*, *supra*, 189 Cal.App.4th at p. 831.)  On appeal defendant contended, among other things, that the evidence was insufficient to establish that the hotel rooms were inhabited dwelling places.  (*Id.* at p. 833.)  We rejected this contention, but reversed the judgment on another ground.  (*Id.* at p. 848.)

On retrial the jury found the robbery of September 19 to be one of the first degree, but that of December 3 to be robbery of the second degree, a lesser included offense.  Defendant now contends that the evidence on retrial was insufficient to establish that the room where the earlier robbery occurred was an inhabited dwelling.  If the evidence on retrial had been the same as at the first trial, our previous decision would establish the

9

law of the case and we would not be required to revisit the issue.  (See *People v. Barragan* (2004) 32 Cal.4th 236, 246; *People v. Mattson* (1990) 50 Cal.3d 826, 850 [decision on previous appeal "controls the outcome only if the evidence on retrial or rehearing of an issue is substantially the same as that upon which the appellate ruling was based"].)  But where on remand 'there is a substantial difference in the evidence to which the [announced] principle of law is applied, . . .  the [doctrine of law of the case] may not be invoked.' " (*People v. Barragan, supra,* 32 Cal.4th at p. 246; see *Mattson*, *supra*, 50 Cal.3d at p. 853 ["[T]he law-of-the-case doctrine is inapplicable to the determination of questions of fact [citation] decided on the basis of new or different evidence in a new trial following reversal on appeal."].)

Here, while we will not adopt defendant's contention that the evidence on retrial was *weaker* than before, we do find the evidence different enough to preclude application of the doctrine of law of the case.  This merely means, however, that our previous judgment is not conclusive, and that we must assess the sufficiency of the evidence as we would in any other case, by analyzing the contents of the record in light of the governing legal principles:  " 'In assessing a claim of insufficiency of evidence, the reviewing court's task is to "review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]  'When reviewing the sufficiency of evidence on appeal, as long as circumstances reasonably justify the fact finder's determination, we must accept it, even though another fact finder m[ight] have reasonably determined the opposite.' [Citation.]" (*Long I.*, *supra*, 189 Cal.App.4th at pp. 837-838.)

## II. The Dwelling House Requirement

The distinction between dwelling houses and other structures arose under the law of burglary, the purpose of which was "to give security and peace of mind to people in

10

their residences." (*Long I*, *supra*, 189 Cal.App.4th at p. 834, citing *People v. Villalobos* (2006) 145 Cal.App.4th 310, 317.)  " 'At common law, burglary was considered 'an offense against habitation rather than against property.  The peace of mind and security of the residents was sought to be protected, rather than the property.' [Citation.]  Burglary laws are ' " ' 'based primarily upon a recognition of the dangers to personal safety created by . . . the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." ' [Citation.]" ' [Citation.]  As one court explained, 'a person is more likely to react violently to burglary of his living quarters than to burglary of other places because in the former case persons close to him are more likely to be present, because the property threatened is more likely to belong to him, and because the home is usually regarded as a particularly private sanctuary, even as an extension of the person.' [Citation.]" (*Villalobos*, *supra*, 145 Cal.App.4th at p. 317; see *People v. O'Bryan* (1985) 37 Cal.3d 841, 844-845 ["An entry into an inhabited space is a serious felony because it presents a greater intrusion upon personal privacy, and a greater risk of violent confrontation, than does entry into an uninhabited area."]; *People v. Cruz* (1996) 13 Cal.4th 764, 775-776 ["[T]he distinction between first and second degree burglary is founded upon the perceived danger of violence and personal injury that is involved when a residence is invaded."])

The distinction between dwelling houses and other places was extended to robbery in order to eliminate a sentencing anomaly whereby a burglar might receive a more severe sentence for merely entering a residence—even if the occupant was absent—than he would have received for committing the inherently more violent crime of robbery in the same place.  (*Fleetwood*, *supra*, 171 Cal.App.3d 982, 987.)  The chief rationale for increased culpability is the same in both cases:  "Victims inside buildings are more vulnerable to felonious conduct than victims out of doors," and "victims inside their residences are especially vulnerable."  (*Id.* at p. 987.)

11

Given these underlying policies, courts have found little reason to question the treatment of hotel rooms as dwellings for purposes of the law of burglary and, more recently, robbery. (See *Fleetwood*, *supra*, 171 Cal.app.3d at p. 988, citing Perkins, Criminal Law (3d ed. 1982) p. 257 ["Historically and traditionally, hotel rooms have been included within the definition of a dwelling house."].) More generally, to be found a dwelling house, a place " 'need not be the victim's regular or primary living quarters' . . . . [Citation.] Rather, the ' " ' "inhabited—uninhabited dichotomy' turns . . . on the character of the use of the building.' " [Citation.] . . . "[T]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusion."[5] [Citation.]' [Citation.] Thus, a temporary place of abode, such as a weekend fishing retreat [citation], a hospital room [citation] or even a jail cell [citation], may qualify." (*Villalobos*, *supra*, 145 Cal.App.4th at pp. 318; *Long I*, *supra*, 189 Cal.App.4th at pp. 834-835.)

### III.  *Application*

In the first appeal we relied upon the presence of "substantial evidence" before the jury "that the victim, *by socializing with a friend and eating meals*, used hotel rooms as living quarters, thereby inhabiting the rooms at the time defendant robbed her." *Long,*

---

[5] Defendant asserts that "[t]his cannot be the correct question" because "[a]nyone who is in a room not open to the public," including a non-retail business, "would consider a burglar or a robber to be making an 'unauthorized intrusion.' " We agree that the emphasis on "structure" is somewhat misplaced, and that burglars and robbers are always unwelcome, wherever they intrude. Defendant is also correct when he quotes our previous decision to say that the key question is " ' " ' " 'the character of the [victim's] use.' " ' " ' " (*Long I*, *supra*, 189 Cal.App.4th at p. 835, quoting *People v. DeRouen* (1995) 38 Cal.App.4th 86, 91, disapproved on another point in *People v. Allen* (1999) 21 Cal.4th 846, 864, 866, fn. 21.) However, the structure of a place is relevant both to its use and to the occupants' expectation of freedom from intrusion. The typical hotel room has most of the structural features that make a home a home—a place to sleep, a place to bathe, places to store belongings, one or more entertainment devices and means of communication, and furniture to facilitate relaxation, work, and perhaps dining. It shares with many non-residential spaces another feature—a lockable door.

12

*supra,* 189 Cal.App.4th 826, 838, italics added.) Here the evidence on that subject was weaker. It indicated only that after the first robbery Amy seemed to feel insecure and to welcome the attentions of her friend Max in the form of small errands, which included bringing her food, and socializing with her between customers.[6] Max testified that he would bring her food and "[m]aybe stay with her, maybe not," but more often "go home." There was no evidence that he joined her in eating this or any other food. Further, there was no direct evidence of any dining activity in the room where the September robbery occurred. Rather it appeared from Max's testimony that his bringing food and sundries to Amy only began after the first robbery, which had "scared" her. While the jury might surmise that Amy had eaten meals in her rooms before this, including the Lanai Gardens room, the evidence fell well short of establishing that she "socialized" in that room or that such meals as she might have eaten there were any more indicative of habitation than is a lunch eaten by a business executive in his or her office.

This deficiency in the record, however, was more than made up for by evidence that Amy sometimes *slept* in the room where the first robbery occurred. Asked whether she was "sleeping" or "living" there, she testified, "Sometimes I stay over; sometime I go home. But mostly I going [*sic*] home." She testified similarly with more general reference to "these hotels," i.e., "Sometime I sleep over; sometime I go in my house." This contrasts sharply with the showing at the first trial, where "[t]here was no evidence of [Amy] sleeping at a hotel." (*Long I*, *supra*, 189 Cal.App.4th at p. 838.) That lack, we emphasized, was " 'not determinative,' " because evidence of sleeping " 'is merely a circumstance used to determine whether a house is inhabited.' " (*Id.* at p. 836, quoting *People v. Hughes* (2002) 27 Cal.4th 287, 354-355.) This is not to suggest, however, that evidence of sleeping in a place is unimportant—only that it is not *indispensable*. The

---

[6] Amy affirmed that by the time of the December 3 incident, she would "talk to Max in between customers," adding, "He bring me food or just talking, like that."

13

domestic activities shown in *Long I*—socializing with a friend and dining—supported a finding that the room was a "home away from home" and thus an inhabited dwelling, notwithstanding the absence of evidence that the victim actually slept there. (*Long I*, *supra*, 189 Cal.App.4th at p. 837) We also suggested that using a room to engage in the kind of intimate activities that typically require seclusion and secure isolation—such as sexual intercourse—supports a finding of habitation, despite the absence of evidence of sleeping.

While the use of a place as sleeping quarters is not a *necessary condition* to a finding of habitation, it may well be a *sufficient basis* for such a finding. We doubt that, generally speaking, any other single factor weighs as heavily in favor of such a finding. Indeed we cannot readily conceive of circumstances in which a finding of first degree robbery would not be sustained if the robbery occurred in a place used by the victim to sleep overnight.[7] As the court observed in *Villalobos*, *supra*, 145 Cal.App.4th at p. 319, " 'We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. . . .' [citation]." The court further noted that while a hotel room used for business purposes might be " 'occupied' " without being " 'inhabited,' " it may still be an "inhabited dwelling" if it is "also being used as a place of *repose*." (*Id.* at p. 321; italics added.)

It thus appears that what the prosecution case lost in evidence of eating and socializing activity in the Lanai Gardens room, it more than made up in evidence that the

---

[7] A more difficult case might be presented by, for instance, evidence that a robbery was perpetrated against a homeless person at his regular sleeping place under a bridge. Certainly that case would be closer than one where the place is by its nature *private*, as a locked hotel room is, in the sense that passersby have neither the right nor the means to enter.

victim sometimes slept in that room. Indeed this evidence may well explain the difference between the verdicts on the two counts of robbery, for while Amy specifically said that she sometimes "stay[ed] over" in the Lanai Gardens room, there was no similarly specific testimony with reference to the Days Inn room. At the same time, the minimal evidence of dining and socializing activity left the jury with little basis on which to conclude that the second room was an inhabited dwelling.[8]

Defendant attempts to dismiss the evidence of "stay[ing] over" by contending that the term "stay" is too vague to establish overnight sleeping. We agree that a passing reference to "staying" in a room might mean something less than sleeping there. But Amy did not merely say that she "stay[ed]" in the Lanai Gardens room. She said that she "stay[ed] *over*." That phrase unequivocally refers to sleeping overnight. (See 16 Oxford English Dict. (2d ed. 1989) p. 583 ["to stay over (orig. U.S.): to stop overnight"]; Definition of stay over in Oxford Dictionaries (US English) (US), <http://oxforddictionaries.com/us/definition/american_english/stay> (as of Apr. 16, 2013) ["stay over" defined as "(of a guest or visitor) sleep somewhere, especially at someone's home, for the night"]; cf. American Heritage College Dict. (3d ed. 1997) p. 1328 ["stay" as "continue to be in a place or condition" or "to remain or sojourn as a

---

[8] The jury may also have weighed the fact that at the time of the first robbery, but not the second, Amy was keeping a fair amount of personal property in her hotel room. (See *Villalobos*, *supra*, 145 Cal.App.4th at p. 318 ["People have an expectation of freedom from unwarranted intrusions into a room in which they intend to store their personal belongings, sleep, dress, bathe and engage in other intimate, personal activities"].) Asked "what things" she had "with [her] in that room," she replied, "I have everything. I have my laptop. I have my purse with me, and I have all the jewelry inside my purse. Personal stuff—you know, wallet and everything is in my purse." She also had her passport, having just returned from a cruise. As a result of that robbery she stopped bringing anything more than the bare necessary minimum into the room with her. At the time of the second robbery, she testified, "I don't have my purse, my laptop. I don't have nothing in the room at that time."

15

guest or lodger"]; Merriam-Webster's Collegiate Dict. (10th ed., 1999) p. 1150 ["to continue in a place or condition," "to take up residence: LODGE"].)

The evidence here also differed from the evidence at the first trial in that Amy was shown to be renting a room in a house occupied by a family of at least four. The defense successfully objected to such evidence in the first trial (see *Long I*, *supra*, 189 Cal.App.4th at p. 832, fn. 5), but here the jury was allowed to consider it. While the jury could certainly find that Amy's having a primary residence contributed to a reasonable doubt about whether her room at the Lanai Gardens was an inhabited dwelling, that fact could not *compel* a reasonable juror to entertain such a doubt. A place otherwise qualifying as a dwelling house does not lose that status merely because the occupant has a primary residence elsewhere. Thus a vacation home may be an inhabited dwelling even when no one is actually occupying it. (*People v. DeRouen, supra,* 38 Cal.App.4th 86, 92, disapproved on another point in *People v. Allen, supra,* 21 Cal.4th 846, 864, 866, fn. 21.) The sporadic nature of the owner's presence may diminish, but it does not eliminate, the concerns that warrant the enhanced penalties for offenses of the first degree: "The potential danger of an unexpected intruder into these dwellings, surprising the occupants and inciting violence is the same potential danger a burglar poses to occupants of their primary residence. The seriousness of the crime does not turn on the fortuity of whether the occupant chose one home or the other on a particular day. . . . [T]he reasonable expectation of the occupant in protection from unauthorized intrusions is determinative. . . . [T]he occupant of a vacation home reasonably expects the same protection from unauthorized intrusions as the occupant of any other residence." (*DeRouen*, *supra*, at p. 92.)

In his reply brief defendant asserts that there was no substantial evidence that Amy "slept in the motel room at issue *on or about September 19, 2006*." (Italics added.) He emphasizes that "when asked about whether she slept there on that date, she said, 'I don't pay attention [to] that.' " This testimony distinguishes the case from *Villalobos*, where it

16

was "undisputed" that the victim intended to sleep overnight in the room. (*Villalobos*, *supra*, 145 Cal.App.4th at p. 321.) Here, however, the question whether Amy "planned" to stay overnight assumed a fact not in evidence, i.e., that the matter was one for premeditation on her part. Amy testified that she "never" brought "overnight stuff with" her to the hotel room. Max testified that among the items he brought her on his various errands were toothpaste and mouthwash. This evidence would ground an inference that the decision whether to spend the night in the hotel room was typically an impromptu one, presumably depending on such factors as the lateness of the hour at which she concluded her prostitution activities. Moreover the jury could find some indication that on this particular night, Amy was likely to choose to remain. It is undisputed that defendant entered her room at 8:33 p.m. Max, who might be motivated to minimize the duration of the typical customer's visit, estimated that they ran from 15 to 25 minutes. But defendant himself, who professed great familiarity with "how these girls work," said that they all follow "the rule, same rule," concerning the duration of the encounter: that "when you pay, whether you ejaculate or not, you have to get it done in 45 minutes. If you go over 45 minutes, you have to pay an additional $120."[9] This would suggest that an encounter beginning at 8:33 p.m. might not end until 9:18 p.m., and could go later if the client paid to go overtime. Even then the day's work might not end if another customer called before Amy stopped accepting business. At best she could not expect to arrive back at her primary home before 9:00 or 9:30 p.m.. She might be disinclined to arrive that late, given that the house was occupied by a family including at least two

----

[9] Defendant's testimony concerning custom and practice among "these girls" also furnished support for an inference that Amy engaged in another habitation-oriented activity in the room: bathing. In an attempt to explain a discrepancy in his testimony about showering with or without Amy on the night of September 19, he said, "Every time I was there a girl would say, 'Pay. Pay up and then go take a shower.' And the rule is the girl would have to take a shower with her client. It's up to the client to choose whether you want the girl to take a shower with you or not."

17

young children, and that she was anxious to avoid giving her landlords any reason to suspect that she was "in trouble with the police or with the law." Since it would seem a simple matter to spend the night in the hotel instead, the jury might infer that by the time defendant came to her door, she would have expected to do so.

We do not find it necessary to conclude, however, that the foregoing series of inferences can support the whole weight of the verdict. In our view even a complete absence of evidence that Amy was likely to sleep in the room *that particular night* would not be fatal to the finding of habitation. Cases have long recognized that a resident's temporary absence will not preclude a finding that a place is an inhabited dwelling for burglary purposes. "[A] line of authority hold[s] that a building which is in current use as living quarters but from which the owner is temporarily absent is inhabited. This construction has been employed consistently in California [citations], and is in accord with the common law and the law of most states [citations]. The implication behind such an interpretation is that the 'inhabited'—'uninhabited' dichotomy turns not on the immediate presence or absence of some person but rather on the character of the use of the building. Drawing the distinction based upon the character of the use of the building meshes with the common law concept of burglary as a violation of the habitation of living quarters. [Citations]" (*People v. Lewis* (1969) 274 Cal.App.2d 912, 918-919.)

Burglary, of course, can be committed against an unoccupied (but inhabited) dwelling. Robbery in contrast is a taking of property from the victim's "person or immediate presence . . . by means of force or fear." (Pen. Code, § 211; but see *People v. Harris* (1994) 9 Cal.4th 407, 422-424 [illustrating breadth of "immediate presence" element].) In both cases, the character of the premises depends not on accidents of presence or absence—past, present, or future—but on the nature of the use to which the place is being put at the time of the offense. Amy's testimony that she sometimes slept in the room established that it was more than a place of business; it was at least sometimes a "home away from home" (*Long I*, *supra*, 189 Cal.App.4th at p. 837) and a " 'place of

18

repose' " (*id.* at p. 835, quoting *Villalobos*, *supra*, 145 Cal.App.4th 310, 321).  The accident that she might not elect to repose there on a particular night did not alter the essential character of the room.

In *Long I*, *supra*, 189 Cal.App.4th at page 838, we suggested that the finding of habitation was also supported by Amy's using the room to engage in sexual activities, because such use independently implicates the concerns underlying the special protection afforded dwelling places.  Defendant urges us to abandon that premise, draw a distinction "between commercial and non-commercial sexual activities," and hold the former not supportive of a finding of habitation.  In *Long I*, *supra*, at page 838, we distinguished a case from the District of Columbia which reduced a first degree burglary charge to second degree burglary because the evidence was insufficient to establish that the rooms in question were, under the relevant statute, "bona fide sleeping rooms."  (*Jennings v. United States* (D.C.App. 1981) 431 A.2d 552, 554, fn. omitted, citing former D. C. Code 1973, § 22-1801(a); see now D. C. Code, § 22-801(a).)  The government there conceded that it had failed to produce evidence sufficient to bring the rooms within the statute.  (*Id.* at p. 555.)  "If anything," the court wrote, "the evidence indicated a contrary result; the rooms were apparently used solely for purposes of consummating prostitution transactions and were occupied essentially for periods of short duration (e. g., 15 minutes to a half-hour)."  (*Ibid*.)  We distinguished that case, writing that "by socializing with a friend and eating meals," Amy "used [the] hotel rooms as living quarters, thereby inhabiting [them]."  (*Long I*, *supra*, at p. 838.)

The same distinction might be drawn here, albeit on the ground that Amy slept in the Lanai Gardens room.  However we reject defendant's suggestion that the sexual activity that took place in the room can be entirely disregarded for habitation purposes solely because of its commercial character.  In this state, "the term ' "inhabited dwelling house" ' has been given a 'broad, inclusive definition.' [Citation.] "  (*Villalobos*, *supra*, at pp. 317-318; *Long I*, *supra*, 189 Cal.App.4th at pp. 834-835.)  Sexual activity,

19

compensated or not, is usually highly private, i.e., typically conducted in a place where the participants are particularly anxious to avoid intrusions of any kind. Moreover it commonly places the participants in a state of vulnerability perhaps exceeded only by sleep and chemically induced stupefaction.

Assuming the commercial character of prostitution might provide a material distinction from other sexual activities under some circumstances, we fail to see how it could be material here. Amy's commercial sexual activities, like most sexual activities, took place in an entirely private space where outside intervention and rescue were exceptionally unlikely. This might have been less true if Amy had run her business more like a dentist's office, making a series of appointments with customers, who would arrive at her door at prearranged times. Instead, she provided her services on an as-needed (and presumably as-available) basis, directing callers first to the hotel and only giving them her room number when they called to report their arrival. As a result a robbery in progress was virtually guaranteed to proceed without risk of interference. The surveillance videos here indicate that the robbery in the Lanai Gardens room transpired over a period of some 45 minutes. We suspect this is several times longer than the average robbery. The privacy and seclusion of Amy's room provided such a luxury of time that defendant felt safe in lingering to force her to pose for nude photographs. We doubt that many victims of a bank robbery have been subjected to anything remotely resembling this indignity, for bank robbers must generally assume the police are on their way. Such dalliance was possible here only because Amy occupied a private room, which no one else was entitled or likely to attempt to enter. The fact that her occupancy was associated with an illicit business, itself peculiarly private in nature, does not preclude a finding that the room was, like most occupied hotel rooms, a dwelling place. The evidence was sufficient to support a finding beyond a reasonable doubt that the robbery of September 19 was one of the first degree.

20

**DISPOSITION**

The judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.

21