Filed 7/17/15  P. v. Valdivia and Cortez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038360 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC963902) |
| v. | |
| JAMARR M. VALDIVIA and RONNIE A. CORTEZ, | |
| Defendants and Appellants. | |

## I.  INTRODUCTION

Jamarr M. Valdivia and Ronnie A. Cortez were convicted by a jury of several counts of vandalism.  The trial court suspended imposition of sentence and placed defendants on probation.  On appeal, defendants argue structural error in the jury selection process under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).  Finding no error, we will affirm.

## II.  TRIAL COURT PROCEEDINGS

Defendants were charged by information with three misdemeanor vandalism counts (Pen. Code, § 594, subds. (a), (b)(2)(A); counts six - eight)[1] and four felony vandalism counts (§ 594, subds. (a), (b)(1); counts one - four).[2]  At the close of the People's case, the prosecution dismissed one of the misdemeanor counts, and the court

---

[1]  Unspecified statutory references are to the Penal Code.

[2]  Cortez also was charged with driving on a suspended license (Veh. Code, § 14601.1, subd. (a); count 5) and pleaded no contest to that count before trial.

1

granted a judgment of acquittal under section 1118.1 as to one of the felony counts. The jury returned identical verdicts, finding each defendant guilty of two misdemeanor vandalism counts and two felony vandalism counts, and acquitting on the remaining felony count.[3]

Jury selection occurred over several days and involved the following process: A panel of potential jurors was sent to the courtroom and, after the court excused panelists for hardship, the clerk called 18 prospective jurors drawn at random from that panel. The first 12 were seated in the jury box and the remaining six sat as a "six pack" nearby. After the 18 prospective jurors were questioned by the court and counsel, the court heard challenges for cause as to all 18, and the parties exercised peremptory challenges as to the 12 seated in the jury box. Jurors remaining in the six pack were moved to vacant seats in the jury box, and the clerk called additional panelists to bring the number of prospective jurors back to 18. After voir dire of new prospective jurors, the court entertained cause and peremptory challenges,[4] and this process was repeated until the parties accepted 12 jurors and two alternates.

On the first day of jury selection, the court excused several panelists for hardship and one for cause. The next day, the court and counsel conducted voir dire of the first 18 prospective jurors, and excused one prospective juror for cause. On the third day of jury selection, the court excused another prospective juror for cause, the prosecutor exercised three peremptory challenges (including challenges against prospective juror 70 and prospective juror 89), and defendants collectively exercised two peremptory challenges. Voir dire resumed with seven additional prospective jurors. After a second voir dire cycle, two prospective jurors were excused for cause, the prosecutor exercised three

---

[3] We do not discuss the underlying facts of the case as they are not relevant to the issues presented on appeal.

[4] Defendants were entitled to a collective total of 20 peremptory challenges, with 10 challenges exercised jointly and five challenges exercised individually. (Code Civ. Proc., § 231, subd. (a).) The People were also entitled to 20 challenges. (*Ibid.*)

peremptory challenges (including one against prospective juror 26), and defendants collectively exercised two peremptory challenges. Voir dire continued with seven more prospective jurors. After a third voir dire cycle, three prospective jurors were excused for cause, Valdivia exercised one peremptory challenge, and the prosecutor exercised two peremptory challenges including one against prospective juror 24. After that excusal, Valdivia made a *Batson/Wheeler* motion, noting that six of the prosecution's seven peremptory challenges were exercised against non-Caucasian panelists.

Valdivia identified the six prospective jurors by their surnames, and described them as having "minority status." Valdivia did not offer the prospective jurors' ethnicities but, when asked, clarified that juror 47 appeared to be of Middle Eastern or Asian descent, and juror 26 appeared to be Hispanic based on her full name. Cortez described juror 26 as being of mixed and Hispanic descent. Cortez joined Valdivia's motion, but limited his joinder only to challenges to "the cognizable group of people of Hispanic descent."

The court found that defendants had met the "very low standard" of a prima facie showing of discrimination. The court also observed that over half of the prospective jurors who had been seated were minorities: Of the 31 prospective jurors seated before Valdivia made his motion, 13 were Caucasian. The prosecutor set forth her reasons for challenging each juror, which we address in greater detail below.

In ruling on defendants' motion, the court noted that the prosecutor's reasons did not need to rise to a challenge for cause and that peremptory challenges could be based on strategy or hunches, "as long as the exclusion was not based on infamous group bias." The court considered the composition of the prospective jury as it stood when the motion was made: Of the 12 remaining jurors who had been called, seven appeared to be white, and five appeared to be minorities, including two Hispanics. As to those who had been challenged, the court continued: "[The prosecutor] did have a reason to excuse them. She perceived them as being unfairly biased against the People; cousin in jail, someone

3

feeling sympathy for the defendants, et cetera, et cetera.  But in each case she was able to provide a non-race based reason.  [¶]  And so that after carefully considering the reasons, the composition of the jury, of the jurors that have been called, and my own observations; the motion is denied."

After the court denied the *Batson/Wheeler* motion and Cortez exercised a peremptory challenge, the clerk called seven more prospective jurors and a fourth round of voir dire proceeded.  The prosecutor attempted to challenge prospective juror 23 for cause.  That juror was one of the two Hispanic prospective jurors among the remaining 12 noted by the court in analyzing the *Wheeler/Batson* motion.  After realizing that she had inadvertently lost the ability to challenge prospective juror 23 for cause by passing on him earlier, the prosecutor indicated her intention to use a peremptory challenge against that prospective juror, and Cortez again raised *Wheeler/Batson* concerns based on the prosecutor's representation.  The court responded that the reasons advanced by the prosecutor to support a cause challenge against prospective juror 23 provided an objective race-neutral basis for a peremptory challenge, and prospective juror 23 was excused.

The following day, prompted by the prosecutor's effort to make a complete record in response to the previous day's *Batson/Wheeler* motion, including additional reasons for challenging prospective juror 23, the court stated its understanding that Cortez had not renewed his *Batson/Wheeler* motion after prospective juror 23 was excused, but had only indicated an intent to do so.  Cortez explained that he thought he had made a *Batson/Wheeler* objection after the prosecutor announced her intention to exercise a preemptory challenge against prospective juror 23, and that the court had ruled on that objection.  The court confirmed that its ruling would not have been different in light of the renewed discussion.

After another day and a half of voir dire, twelve jurors and two alternate jurors were sworn.

4

# III. DISCUSSION

## A. LEGAL PRINCIPLES

The Equal Protection Clause prohibits the prosecution from exercising peremptory challenges based on race or on the assumption that jurors who share defendant's race as a group cannot be impartial. (*Batson*, *supra*, 476 U.S. at p. 89.) In *Wheeler*, the California Supreme Court held that the right to a trial by jury drawn from a representative cross-section of the community under the California Constitution prohibits the use of peremptory challenges to remove prospective jurors solely based on group bias. (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) *Wheeler* defined group bias as bias against "an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*Id*. at p. 276.) The defendant need not be a member of the excluded group to assert a violation of the cross-section rule. (*Id*. at p. 281.)

*Batson* provides a three-step process for a trial court to determine whether equal protection is denied by the prosecution's exercise of peremptory challenges. A defendant first establishes a prima facie case of discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Batson*, *supra*, 476 U.S. at pp. 93-94.) The burden then shifts to the prosecution to provide a neutral " 'clear and reasonably specific' " explanation for the challenge. (*Id*. at pp. 97-98, & fn. 20.) "The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136.) After the prosecution offers its explanation, the trial court determines whether the defendant has established purposeful discrimination. (*Batson*, at p. 98.) The same three-step inquiry applies to *Wheeler* challenges. (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).) The prima facie inference of discrimination is a legal question subject to independent review. (*People v. Bonilla* (2007) 41 Cal.4th 313, 342.)

The trial court's ruling at the third step of the *Batson/Wheeler* inquiry is a factual determination which we review for substantial evidence. (*People v. Williams* (2013) 56

Cal.4th 630, 650; *People v. Lewis* (2008) 43 Cal.4th 415, 469, rejected on other grounds in *People v Black* (2014) 58 Cal.4th 912, 919-920.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) A finding of purposeful discrimination, even as to one prospective juror, is structural error requiring reversal. (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

## B.    CHALLENGES TO TWO ASIAN-AMERICAN JURORS

Valdivia voiced a *Batson/Wheeler* objection after the prosecutor exercised six of seven peremptory challenges against persons of "minority status." He presses on appeal that substantial evidence does not support the trial court's findings of no purposeful discrimination as to two Asian-American prospective jurors.

### 1.    *Batson/Wheeler* Step One

Although the trial court made a prima facie determination of discrimination based on the minority status of six prospective jurors, Valdivia's motion regarding prospective jurors 70 and 89 should have been viewed as a *Wheeler* objection to the prosecution's exercise of peremptory challenges against Asian Americans. (*People v. Bell* (2007) 40 Cal.4th 582, 599 [acknowledging Asian Americans as cognizable group].)

Other than pointing out that prospective jurors 70 and 89 were among six non-white prospective jurors against whom the prosecution exercised peremptory challenges, Valdivia made no showing that the peremptory challenges were motivated by bias against a particular group. An inherent inference of group bias against Asian-American prospective jurors is not present in this case. The record reflects that Valdivia and Cortez are not Asian (see *People v. Bonilla*, *supra*, 41 Cal.4th 313, 342 [recognizing a defendant who is not a member of the relevant group cannot "benefit[ ] from whatever force his

6

group membership would otherwise have had in supporting an inference of discrimination"]), and one of the testifying vandalism victims had an Asian surname. We also note here the composition of the group of prospective jurors who had been drawn from the jury panel before Valdivia made his motion, 40 percent of the group being white and 60 percent nonwhite.

### 2. *Batson/Wheeler* Step Three

#### a. Prospective Juror 70

Defending her first peremptory challenge against prospective juror 70, the prosecutor explained: "[She] is a preschool teacher and caretaker. What concerned me is that she said that she was not able to make a decision when given two sides of a similar event. And she is going to be asked to do exactly that. [¶] She noted that she would ask for other information, but that she was unable to make a decision based on two different accounts of the situation. [¶] [S]he also noted something to the effect that she could not be sure something happened unless she saw it. And circumstantial evidence is going to be part of this case; therefore, I believe that she would be biased against the prosecution."

The prosecutor offered a valid race-neutral reason to excuse prospective juror 70 supported by substantial evidence in the record. (See *People v. Stevens* (2007) 41 Cal.4th 182, 194-195 [inability to make a decision without all the information, facts, or evidence demonstrated ambivalence].) When asked by counsel for Cortez how she makes a credibility decision as a pre-school teacher, she explained: "Well, like if there's a situation between two children, I try to gather as much information as I can from each child to get the final conclusion. And then there still might not be a resolution. So I still might not find out what did occur. I don't take one side or the other in that case because if I didn't witness anything, I can't blame one or the other. [¶] But from that situation on I just kind of have to keep my eyes open to see where the truth lies. And hopefully eventually gather more information, that way I can see where the problem is really

7

coming from. But I don't take the word of one or the other if I didn't see anything that occurred, but I do try to take information from both sides."

Following up with the prosecutor, she continued: "I can't go with one side or the other, because there is always a little truth on each side, and a little untruth on each side. But I have to go with what I'm given, and if that is not enough to reach a resolution, then I have to go with further observation and then garner information from that." She said that she could make a decision when she gathered additional information.

Citing *Silva*, *supra*, 25 Cal.4th 345, Valdivia argues that the prosecutor's assertion that prospective juror 70 was unable to make a decision is contradicted by the record; thus, deference should not be accorded to the trial court's finding of no purposeful discrimination. In *Silva*, the prosecutor's stated reasons for exercising a peremptory challenge against an Hispanic-American prospective juror were unsupported by the record but were accepted without question by the trial court in an improper ex parte hearing that excluded the defense. (*Id*. at p. 385.) Concluding that the trial court's finding regarding the peremptory challenge was unreasonable, the *Silva* court explained that it would not accord " 'great deference' " to the trial court's genuineness determination "[w]hen the prosecutor's stated reasons are either unsupported by the record [or] inherently implausible." (*Id*. at pp. 385-386.)

Here, the record does not contradict the prosecutor's stated reason to excuse prospective juror 70. The juror explained that in some unwitnessed situations between children, she could not believe one child over the other. She elaborated that in some situations she would need more information before she could make a decision. The record supports a valid concern by the prosecutor that prospective juror 70, who often needed to fall back on information gathering, could have difficulty reaching a decision in a case supported by limited and circumstantial evidence.

### b. Prospective Juror 89

The prosecutor explained her basis for excusing this prospective juror: "[She] is a school psychologist. Counsel for defense has retained a psychologist to speak about memory and eyewitness identification. [¶] I do not like psychologists on the jury because I think that they often overshoot the mark; that they are in a caretaking industry which makes me believe that they would be more sympathetic towards the defendants, wanting to perhaps fix them as opposed to hold them accountable for actions if they are proven against them. [¶] She also noted specifically that she feels sympathy for the defendants as they sit here in court demonstrating a bias for the defense."

Valdivia argues that the prosecutor's explanation was a serious mischaracterization of the voir dire testimony, and that the trial court's finding is not entitled to *Silva* deference or supported by substantial evidence. But Valdivia does not challenge the prosecutor's primary reasons for excusing this prospective juror-she did not like psychologists on juries in general because she perceived them to sympathize with defendants, and she did not want a psychologist on this jury in particular because the defense would be calling a psychologist as an expert witness. Those reasons alone are valid race neutral grounds to exercise a peremptory strike. (*People v Ledesma* (2006) 39 Cal.4th 641, 678 [multiple reasons, individually and in combination, may support a race-neutral basis for a peremptory challenge].) Valdivia focuses solely on the prosecutor's claim that juror 89 specifically felt sympathy for defendants, and the trial court's mistaken recollection that the juror had responded affirmatively when asked whether she had sympathy. She had actually stated: "I don't feel sympathy, but at the same time they are entitled to get a fair trial. And just like you said, until proven guilty. And based on the evidence that will be presented both by witness or whatever they come up with, my feeling is still neutral." Neither the prosecutor's characterization nor the court's misrecollection of that response undermines the trial court's finding as to prospective juror 89.

9

This is not a situation, as in *Silva*, where none of the prosecutor's stated reasons was supported by the record. Nor is this case similar to *People v. Long* (2010) 189 Cal.App.4th 826 (*Long*), as Valdivia urges. In *Long*, the prosecutor gave two reasons for a peremptory challenge against a Vietnamese prospective juror. By not participating in group voir dire or making eye contact with the prosecutor, the prosecutor characterized the prospective juror as "a [non]participating member of the jury." The prosecutor also was uncomfortable with the prospective juror's body language. (*Id*. at p. 843.) Because the prosecutor's first stated reason in *Long* was inaccurate (the record showed that the prospective juror had participated in group voir dire), that court declined to defer to an implied trial court finding regarding the prospective juror's behavior. (*Id*. at p. 848.) In contrast here, the prosecutor's first reason for excusing prospective juror 89-her profession-was both supported by the record and was sufficient to support a peremptory challenge.

"The purpose of a hearing on a *Wheeler/Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race neutral." (*People v. Jones* (2011) 51 Cal.4th 346, 366 (*Jones*).) The trial court was of the view that the prosecutor's reasons were genuine. We will defer to that determination which is supported by substantial evidence.

## C. CHALLENGES TO TWO HISPANIC-AMERICAN PROSPECTIVE JURORS

Both Valdivia and Cortez challenge the trial court's *Batson/Wheeler* rulings pertaining to two Hispanic prospective jurors. In addition to arguing that substantial evidence does not support the court's decision, defendants contend that a comparative analysis of sworn jurors shows that the prosecutor's reasons for excusing the Hispanic prospective jurors were pretextual.

10

### 1.       Prospective Juror 26

Prospective juror 26 stated that she was "not working right now," that she had "a live-in boyfriend who is a carpenter," that she had four children, ages 17, 15, 13, and 12, and that she had lived in Santa Clara County for 31 years.  She disclosed that she had been arrested for D.U.I. (driving under the influence) "about seven years ago," that she believed there was no conviction, that she wasn't sure whether the case was dismissed or there was a plea, and that she paid fines and did what she had to do to get her license back.  The court then pressed:  "So you plead guilty or no contest?"  She responded affirmatively and said that the D.U.I. occurred in Gilroy.  She responded "no" to the court's inquiry whether the experience would affect her ability to be a fair and impartial juror or whether she would hold anything against a San Jose police officer.  She confirmed to the prosecutor that she was not currently employed but that she had worked previously.

The prosecutor offered the following reasons for excusing prospective juror 26:  "Although there was no questioning of this witness of her racial background or her last name  . . .  she noted that she's unemployed.  And that she has a live-in boyfriend who's also unemployed.  She has four children ranging in ages from 17, 14, 15, 12, I think she actually said a fifth, but I missed the name on it.  [¶]  The fact that she was, looked to me very young with children of those ages caused some concern for me considering that she is unemployed, and has multiple mouths to feed.  I didn't think that she could sit here and give this trial the full attention it deserves.  [¶]  She also noted that she herself was convicted of a D.U.I. which is leading me to believe that she may carry a prejudice against the People's case."

After the prosecutor stated her reasons for excusing the six challenged jurors but before the court ruled on defendants' motion, Cortez argued that unemployment or number of children could not be considered a bias, to which the court responded "I dismissed that.  I wasn't considering that, but it was a follow-up that I took note of."  In

11

response to a comment made by Cortez the following day that the prosecutor's reasons for challenging prospective juror 26 were specious, the court noted: "The first reason that [the prosecutor] was giving, especially about having many children, and the ability to support them, I found that those were, that was not the basis. Had it just been that, you know, my ruling would probably have been different."

Defendants argue that the prosecutor's primary reason to excuse prospective juror 26-distracting financial concerns-is not supported by the record and therefore shows discriminatory pretext. We agree with the trial court that a peremptory challenge cannot be exercised based on a prospective juror's social or economic class. (*Wheeler*, *supra*, 22 Cal.3d at pp. 271-272.) Exercising a peremptory challenge for those reasons would contravene the representative cross-section rule. (*Ibid*.) But a peremptory challenge can be exercised against a juror based on a concern that she will not be able to give her full attention to the trial, which was the reason stated by the prosecutor and supported by substantial evidence in the record. The prosecutor understood that juror 26 had been formerly employed but was not currently working. She had four minor children and appeared young herself. She was first uncertain about whether she had a D.U.I. conviction but then confirmed it after further questions, which to the prosecutor demonstrated a lack of acumen.

Defendants point to the prosecutor's claim that both prospective juror 26 and her live-in boyfriend were unemployed, while she had actually stated that she "[was] not working right now," and her "live-in boyfriend [was] a carpenter." The responses can fairly be understood to mean she was out of a job. Although she stated that her boyfriend was a carpenter, she did not state whether or not he was working. Defendants also find fault in the prosecutor's recollection that juror 26 might have a fifth child. But the prosecutor's imprecise recollection does not demonstrate pretext. (*Jones*, *supra*, 51 Cal.4th at p. 366.)

12

Relying on *Miller-El v. Dretke* (2005) 545 U.S. 231 (*Miller-El*), defendants press that the prosecutor's concern with the D.U.I. conviction was a pretext for discrimination because it was offered as an afterthought, the prosecutor did not probe prospective juror 26 about her concern, and the prosecutor did not excuse similarly-situated jurors who had been arrested or had family members arrested for D.U.I. In *Miller-El*, the Supreme Court granted federal habeas corpus relief to an African-American inmate in Texas, concluding that the state court's reasons supporting the absence of racial discrimination in the capital inmate's jury selection process were not supported by clear and convincing evidence. (*Id.* at p. 266.) The *Miller-El* court engaged in a comparative juror analysis which showed "that race was significant in determining who was challenged and who was not." (*Id.* at p. 252.) The Supreme Court explained: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id.* at p. 241.) In further rejecting the prosecutor's reasons for striking a prospective African-American juror, the high court characterized as an afterthought the prosecutor's explanation-the prospective juror's brother's prior conviction-that he provided only after defense counsel had discredited an earlier-stated reason as patently false. (*Id.* at p. 246.)[5]

_____

[5] In addition to performing a comparative juror analysis, the high court considered broader patterns of discriminatory practice in the prosecutor's jury selection, including shuffling the jury cards to rearrange the order in which members of the panel were seated and questioned, disproportionately questioning prospective African-American jurors using a script describing a capital execution in graphic clinical detail to generate hesitation about capital punishment, and engaging in similar improper questioning. (*Miller-El*, *supra*, 545 U.S. at p. 255.) The Court also considered the Dallas County prosecutor's then-existing policy of systematically excluding African Americans from juries. (*Id.* at pp. 263-264.) These types of concerns are entirely absent from the record in this case.

Here, the D.U.I was part of the prosecutor's stated reason for excusing juror 26, and we see no pretext in that reason merely because it was the second stated basis for the peremptory challenge. Unlike *Miller-El*, there was no interjection by either defendant that the prosecutor was wrong about the juror's household employment status, or how many children she had before the prosecutor cited the D.U.I. as another basis to excuse her.

We are also unpersuaded by defendants' comparative juror analysis. The Attorney General aptly points out that a comparative analysis review advanced for the first time on appeal has inherent limitations. The prosecutor was not given the opportunity to respond to the similarities defendants glean from the transcript. (*Lenix*, *supra*, 44 Cal.4th at p. 623.) Indeed, a transcript may show panelists providing similar answers but "it cannot convey the different ways in which those answers were given." (*Id*. at p. 623.) A transcript of questions and answers alone cannot convey "tone of voice, gesture, expression or hesitation." (*Ibid*.) Nor was the trial court provided the opportunity to evaluate defendants' arguments in light of "what it has seen and heard." (*Id.* at p. 624.)

Unlike *Miller-El*, where the Supreme Court found strong similarities and insignificant differences between African-American prospective jurors and other prospective jurors (*Miller-El*, *supra*, 545 U.S. at p. 247), the record here reveals neither. Only one prospective juror (prospective juror 87 sworn as Juror No. 1) who was seated and questioned before the prosecutor excused prospective juror 26 had a D.U.I. arrest history. Those arrests were remote, being 15 and 25 years old. And Juror No. 1, an engineer, had served on a civil jury in an eminent domain matter and understood the different standards of proof in civil and criminal cases. Juror No. 1' s occupation and his previous jury service demonstrated maturity and an ability to focus and meaningfully contribute to deliberations. (*Lenix*, *supra*, 44 Cal.4th at p. 624 ["[T]he risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable."].)

14

The potential inability to fully focus on the trial and her more recent D.U.I. conviction are neutral bases supporting the prosecutor's preemptory challenge to prospective juror 26. On the totality of the record, including the absence of extensive colloquy between the prosecutor and juror 26, either one of those bases supports the trial court's finding. Defendants have failed to show that this juror was excused based on her Hispanic ethnicity.

### 2. Prospective Juror 24

Prospective juror 24 disclosed in voir dire that she had a cousin who was currently in jail. She told the prosecutor that she was "[not] okay with that." When asked whether she thought the system was fair to her cousin, she responded "No, [be]cause he was sentenced to 25 years to life." The colloquy continued: "[Prosecutor]: How do you feel about prosecution, the prosecutor, my side? [Juror 24]: Hum. I don't know what to say. [Prosecutor]: What happened with your cousin, would you hold that against the prosecution? [Juror 24]: I don't think so. [Prosecutor]: Do you have negative feelings about the prosecution because of your cousin's situation? [Juror 24]: Kind of. [Prosecutor]: Do you not like the district attorney's office because of the situation with your cousin? [Juror 24]: No, I don't have anything against them. [Prosecutor]: Because of the situation with your cousin, just sitting here in court and seeing the defendants before you, do you feel sympathy for their situations? [Juror 24]: Yeah."

The prosecutor challenged juror 24 for cause, asserting that she had expressed a problem with the prosecution because she thought her cousin was treated unfairly, and noting her sympathy for defendants. The court found that the prosecutor's reasons did not meet the cause threshold, since the juror had no strong feelings against the district attorney's office. But the court acknowledged the juror's sympathy for defendants. The court explained that it would address that sympathy through an instruction, observing "others didn't mention it, but maybe they feel that way, too."

15

The prosecutor exercised a peremptory challenge against prospective juror 24, explaining: "[S]he mentioned that she had a cousin in jail. She did not like that situation. She felt she was not happy about the prosecution. She feels sympathy merely for the defendants being here present." The juror's stated discontent with her cousin's incarceration and her expressed sympathy for defendants are neutral reasons supporting the peremptory challenge. (*People v. Cruz* (2008) 44 Cal.4th 636, 658 [sympathy toward defendant's intoxication and lack of rapport with prosecution is race neutral].)

Valdivia argues that the trial court's finding of no purposeful discrimination was insufficient as to juror 24 because the court had earlier rejected the prosecutor's cause challenge based on bias against the prosecutor's office. But the standard for a peremptory challenge is different from the standard for a cause excusal. (*Jones*, *supra*, 51 Cal.4th at p. 367 ["[A] peremptory challenge is not a challenge for cause [and] may be exercised whenever a legitimate reason appears for a party to worry whether that juror will be impartial."].) The record supports the prosecutor's concerns regarding trepidation about the prosecution and sympathy for defendants. Unlike *Silva*, here the prosecutor's stated reason-sympathy for defendants-is clearly found in the record. That reason was not invalidated merely because the court rejected it as the basis for a cause challenge. The court's finding under *Batson*/*Wheeler* was sufficient and supported by substantial evidence.

Citing the *Miller-El* comparative juror analysis, defendants press that the prosecutor's failure to ask other panelists about sympathy, their criminal history, or the criminal history of their relatives, demonstrates pretext. Valdivia identifies six jurors in particular who had been arrested or had a family member who had been arrested, and asserts that the prosecutor did not explore whether that would affect their impartiality.

Sworn Juror No. 1, as we have already discussed, was an engineer who had prior civil jury service, and his two D.U.I. arrests occurred well in the past. He confirmed that those arrests would not affect his ability to serve as a juror.

16

Juror No. 2 (prospective juror 69), a retired elementary school teacher, testified that one of her adult children had recently been arrested for D.U.I. and domestic violence, and had pleaded no contest. When asked whether she had positive or negative feelings toward the criminal justice system, the police or the prosecution, she explained: "I think it was all handled great. It has been very trying. It has been a whole new experience, never thought I would ever experience it. We've had wonderful support on both sides," and "I don't feel it would affect my judgment in this case at all." She responded to Cortez's counsel that she could be fair to defendants even though they were exercising their right to a trial instead of entering a plea as her son had.

Juror No. 3 (prospective juror 11), a financial analyst and auditor, had been employed by the City of San Jose where she conducted performance audits of the San Jose Police Department. Her father and uncle were retired Department of Corrections law enforcement officers, and she had recently been an accident victim in a felony D.U.I. In that regard, she had cooperated with all parties, and she felt the police department and the district attorney's office had conducted their jobs well. She felt she could be a fair and impartial juror because of the objectivity demanded of her as an auditor. Juror No. 3 also stated that her sister had recently been arrested for D.U.I. She responded to the court's inquiry about that arrest: "She plead guilty. She's done with that," and there was no reason that experience would affect her ability to serve as a juror.

Juror No. 7 (prospective juror 33), a commercial real estate executive, had professional exposure to contract law, and had been deposed in a work-related matter. She had a cousin whom she had lost contact with who had been "in and out of jail the last couple of years." She had "no idea" what for. The prosecutor questioned Juror No. 7 on defendants' right to remain silent and the prosecutor's burden of proving the case beyond a reasonable doubt.

Juror No. 12 (prospective juror 50), a high tech industry salesman, testified that his cousin had been arrested for assaulting a customer while working at The Home Depot.

His cousin had shared no details about the incident, but Juror No. 12 thought it was his cousin's fault, and it engendered no bias.

Comparing the voir dire of these jurors with that of prospective juror 24 reveals no disparate treatment.[6] Ample reasons apparent from the record support the prosecutor's selection of Jurors Nos. 1, 2, 3, 7, and 12 without casting any suspicion on her treatment of prospective juror 24. Jurors Nos. 1, 2, 3, and 12 each explained that the arrest(s) would not affect their ability to serve as jurors, and Juror No. 7 was clear that she had lost touch with her cousin and knew nothing of her cousin's encounter with the law. Since neither the trial court nor defense counsel had asked juror 24 whether her cousin's case had any bearing on her ability to serve as a juror, that inquiry, if it were to be made, was left to the prosecution. On this record, no pretext is demonstrated by the prosecutor's colloquy with juror 24 about her cousin.

Nor do we accept Valdivia's strained read of the trial court's comment about a sympathy instruction-that "others didn't mention it, but maybe they feel that way, too"-as suggesting that the prosecutor's failure to question other prospective jurors about sympathy undermined her credibility. We view the court's comment to mean that others besides prospective juror 24 would also benefit from the instruction, which would be read to the whole jury.

Cortez argues that substantial evidence does not support a race-neutral peremptory challenge as to juror 24 because her bias was against the three-strikes law, not the prosecution, and that bias was not a legitimate race-neutral reason. We disagree for

---

[6] Our analysis is circumscribed by the timing of defendants' *Batson*/*Wheeler* motion. We do not consider the voir dire of Juror No. 6, identified in Valdivia's opening brief, because it occurred after the trial court ruled on the motion. (*Lenix*, *supra*, 44 Cal.4th at p. 624.) Although Juror No. 2 and Juror No. 7 also were called to the jury box and questioned after the court ruled on defendants' motion, we will consider their voir dire because Cortez renewed his motion after those jurors were questioned, when the prosecutor exercised a peremptory challenge against prospective Juror 23.

several reasons.  First, the juror's stated sympathy for defendants is substantial evidence of a neutral reason to excuse her.  Second, although her responses did not prompt a challenge for cause, she expressed some discomfort with the criminal justice system, which further supported the prosecution's peremptory challenge.  Finally, even if her concern lay only with the three-strikes law, which is not shown by the record, that is a valid neutral reason to exercise a peremptory challenge.

## D.    CUMULATIVE ERROR

Valdivia argues that cumulative evidence establishes *Batson/Wheeler* error.  We do not agree with Valdivia that there was evidence of pretext spanning multiple minority panelists.  Substantial evidence supports the trial court's determination that race-neutral reasons existed for the prosecutor's exercise of peremptory challenges to prospective jurors 24, 26, 70, and 89.

## IV.  DISPOSITION

The judgments are affirmed.

_____

Grover, J.

**WE CONCUR:**


_____

Bamattre-Manoukian, Acting P. J.



_____

Mihara, J.




*People v Valdivia and Cortez*
H038360